# GEORGE C. WEGEFARTH

## *vs.*

# GEORGE F. WIESSNER AND HENRY F. WIESSNER AND THE JOHN F. WIESSNER & SONS BREWING COMPANY.

*Caveats: no damages for filing. Settlements under seal. Fraud: allegations and evidence. Equitable relief: essentials; injury to complainant.*

No damages can be predicated on the filing of a caveat to a will, even though it were filed maliciously and without probable cause.                                                             p. 568

Evidence of fraud, to warrant a court in submitting it to the jury, as to the validity of an instrument under seal must be clear and satisfactory.                                              p. 569

Deliberate settlements and solemn instruments are not to be impeached by light and trivial circumstances which at most furnish a foundation for ingenious minds to speculate upon.

p. 569

Fraud, to be ground for relief, must work an actual injury to the party complaining, and it must appear that he not only did rely upon the fraudulent statement, but that he had a right to rely upon it in the full belief of its truth.                       p. 570

*Decided June 24th, 1919.*

Appeal from the City Court of Baltimore City. (HEUIS-LER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and AD-KINS, JJ.

*Wm. L. Marbury* and *Edward M. Hammond,* for the appellant.

*Albert C. Ritchie* and *Charles F. Harley,* for the appellee.

Burke, J., delivered the opinion of the Court.

This case has been twice argued in this Court. A motion to dismiss the appeal was denied for the reasons stated in the opinion filed April 25, 1918, in the case of *Wegefarth* v. *Wiessner and others,* 132 Md. 595, and a reargument of the case was ordered on July 10, 1918. In view of the length of the record, which is very voluminous, we shall confine our consideration to what appears to us to be the essential and determining facts in the case.

The declaration contains four counts and, in addition to the general issue pleas, the defendants set up pleas of accord and satisfaction, evidenced by releases under seal and other written documents by which it was intended that a compromise and settlement in full discharge of all mutual matters and litigation between the parties should be made. The pleas setting up the settlement were traversed by the plaintiff, and issue was joined upon the traverse. Both the declaration and special pleas are lengthy, and we do not find it necessary to quote from them to any great extent in this opinion. The ground of the action is an alleged conspiracy upon the part of the defendants to obtain, and by which it is alleged they did obtain, from the plaintiff at a greatly reduced price, by means of fraud, threats and coercion, twenty-five shares of the capital stock of the John F. Wiessner & Sons Brewing Company, a corporation of Baltimore City, hereinafter referred to as the Brewing Company.

At the conclusion of the plaintiff's case the Court granted the following prayers:

"No evidence has been offered legally sufficient to entitle the plaintiff to recover in this case, and the verdict of the jury must, therefore, be for the defendants."

"Under the pleadings in this case, no evidence has been offered legally sufficient to entitle the plaintiff to recover; and the verdict of the jury must, therefore, be for the defendants."

The jury rendered a verdict for the defendants, and from the judgment entered thereon in favor of the defendants the plaintiff has brought this appeal.

The record shows that the Brewing Company was founded by John F. Wiessner, who died leaving surviving him the following children, viz, Frederick Wiessner, George F. Wiessner, Henry F. Wiessner, Elizabeth Ann Wiessner, who married Frederick W. Lipps, and Margaret Wiessner, who married the plaintiff in 1901. The capital stock of the Brewing Company consisted of one hundred shares, and each of the above mentioned children of John F. Wiessner owned twenty shares. The brewery, which was a highly successful and profitable business, paying large dividends, was managed exclusively by the sons. It was regarded strictly as a family institution in which the children of its founder took a great deal of pride. Frederick Wiessner died intestate in 1907, and his twenty shores of stock were distributed in equal proportions among his two brothers and two sisters, thus making the holding of each twenty-five shares.

At the time of the marriage of the plaintiff to Margaret Wiessner she owned stocks and bonds in her own right in excess of one hundred thousand dollars, in addition to her twenty shares of stock in the Brewing Company. This stock was very valuable, and her fortune was subsequently increased by the death of her brother Frederick. The plaintiff was a practicing physician at the time of his marriage, but about the year 1905 he abandoned the practice of medicine and engaged in real estate development on quite a large and expensive scale. We here quote from his testimony as to the extent of his real estate operations: "In 1905 he organized the Evergreen Lawn Land & Improvement Company, a company which was developing twenty-five acres at the corner of Hamilton avenue and Harford road, in Hamilton. The stockhold-

ers in the Evergreen Lawn Land & Improvement Company were Frederick W. Lipps and his wife and witness's wife and himself; each owned one-fourth interest in the tract, in the company. That company engaged in very active real estate operations; the first year, I think, they put up buildings to the extent of one hundred thousand dollars or more, dwellings and stores and business property. It was a suburban development at Hamilton, on the Harford road and Hamilton avenue. That is about one mile outside of the city limits. Witness was president of the Evergreen Lawn Land & Improvement Company, Mr. Frederick W. Lipps was treasurer, and Mr. C. R. Wattenscheidt was secretary. Mr. Wattenscheidt is a nephew of Mr. Frederick W. Lipps.

"Witness then organized the City & Suburban Realty Company, which was composed of his wife and himself. We each held half-interest. That company purchased 218 acres adjoining the Evergreen Lawn Land & Improvement Company at Hamilton, and also 104 acres at Mount Washington, and we were also engaged in the development of city property; we built two-story houses as well as suburban cottages. That the great expense of the City & Suburban Realty Company in the first year of its existence was the overhead charge. We had these large tracts of land, which had to be purchased a number of years before the time of development in order to get the land at a low enough figure to justify carrying it until the opportune time of development. Our expenses in that company were very heavy. The company was not very active for the first five or six years. Overhead charges were the interest charges, the taxes, the office expenses, the maintenance of the property and carrying it, and a certain amount of help required to keep it in order. In this case we had to build our own water plant, drill artesian wells and extend water mains and gas mains and all those details which are preliminary in the development of property. The money was gotten by the sale of the stock which my wife had, which stock was turned into money to pay for this property and for the carrying along of the overheads. The company did borrow

money from banks. We borrowed from the Merchants National Bank; the principal loan was from the Merchants National Bank. The time we began borrowing was the time our dividends were cut from the brewery. In purchasing these large tracts of land we calculated on having this large income and we would have a surplus as the result of it, and our idea was to take that surplus and pay off on these tracts of land which we had purchased, and carry them along until the time came to market them to advantage. Instead of receiving the usual amount of dividends, we were cut off. My wife had twenty shares of the J. F. Wiessner Brewing Co. in 1905. In 1905 she received twenty thousand dollars' dividend. The year before that she received about nineteen thousand dollars. She had been receiving dividends all along on this stock after our marriage, so far as I knew."

Mrs. Wegefarth died in May, 1912. The dividends on the stock were regularly paid to her during her life, and after her death to the plaintiff as her executor, until June, 1914, when the dividends were withheld under the circumstances hereinafter stated. Mrs. Wegefarth left a last will and testament, dated June 4, 1909, which was admitted to probate by the Orphans' Court of Baltimore City. By this will, after bequests of $33,000.00 to certain persons and charitable institutions, she devised and bequeathed all the rest and residue of her estate to her husband, and appointed him executor, and letters testamentary were duly issued to him by the Orphans' Court.

At the date of Mrs. Wegefarth's death, the City & Suburban Realty Company, which as we have seen was composed of the plaintiff and his wife, each holding a one-half interest, was indebted to the Merchants-Mechanics National Bank—which will be referred to hereafter in this opinion as the Bank—in the sum of $86,000. This indebtedness was evidenced by the note of the company, endorsed by the plaintiff and his wife and secured by the hypothecation of stock of the company and the 25 shares of the brewery stock owned by Mrs. Wegefarth. This stock then stood in her name upon the

books of the Brewing Company and was deposited by her as collateral security for the note. · After the death of Mrs. Wegefarth the plaintiff borrowed $34,500.00 additional from the Bank upon the understanding and agreement that the brewery stock should likewise be held as collateral for this as well as for the prior loan. So that at the time this controversy arose, the plaintiff was indebted to the Bank in the sum of $120,500.00 for the payment of which the brewery stock was pledged. Doctor Wegefarth settled the estate in the Orphans' Court, and distributed this stock to himself as residuary legatee under his wife's will, and by an order of the Orphans' Court dated the 10th day of June, 1914, he was ordered as executor to cause to be transferred said twenty-. five shares of stock to himself individually.

Frederick Wiessner had caused to be prepared a will by which his twenty shares of stock should pass upon his death to his brothers, George F. and Henry F. Wiessner, but had died without executing the will. The will was prepared in pursuance of an understanding between himself and his brothers that each should make a will bequeathing his stock to the survivors in order that they might have control of the affairs of the brewery. Both Henry and George made wills carrying out this arrangement. The death of Frederick intestate left his two brothers without owning a majority of the stock. They were evidently much disappointed, although they made no complaint or claim during Mrs. Wegefarth's life for the five shares which passed to her upon Frederick's death. They regarded the concern as an exclusively family business to be managed and controlled by the family, and when they found that under the will of their sister the five shares had passed to Doctor Wegefarth, they took the position that, in view of the understanding between themselves and their deceased brother, these five shares should be given to them, and thereby they would secure control of the business. There was, of course, no legal basis for this claim, but they seemed to think that under the circumstances they had some kind of a moral claim upon the stock. They asked Doctor Wegefarth to give

them the five shares which his wife had gotten from the estate of her brother Frederick. This he refused to do. The twenty-five shares of stock owned by Mrs. Wegefarth were appraised at $75,000.00, and the final account of the plaintiff as executor appears to have been passed on March 13, 1914. In February, 1914, George and Henry Wiessner employed counsel with a view of filing a caveat to Mrs. Wegefarth's will.

In April, 1914, at a meeting at the Hotel Rennert between the plaintiff and Henry F. Wiessner, the latter told the plaintiff that he was authorized by his brother George to offer him $75,000.00 for the 25 shares of stock. We quote from the plaintiff's evidence as to what was said when this offer was made: "I said, 'What is the stock worth?' He said he didn't know. I said, 'How much money have you got in bank?' He said, 'I don't know.' I said, 'What is the net profits of the business each year?' He said he didn't know. I said, 'It doesn't look very fair for me to sell you this stock for seventy-five thousand dollars and not have an idea of what it is worth.' I said, 'I will tell you what I will do.' I said, 'Suppose you go back to your brother and tell him that I have no objection to his buying the stock if they do not want me in the business; I am not anxious to stay in, but I will not lay anything in the way of remaining in it. You appoint a representative or an auditor and I will appoint one and we will take the third one for a referee, and whatever they say goes with me.' He said——

"Q. Wait a minute; I do not quite understand that. You suggested to him that they should appoint an auditor? A. Yes.

"Q. For what purpose? A. To examine the books.

"Q. The books of the J. F. Wiessner Brewing Company? A. Yes; to find out what the stock was worth.

"Q. And that you should appoint one and he appoint one, and those two should select a third? A. Yes; to go over the books and to find out what the stock was worth.

"Q. What then? A. He says, 'There is no use in going back; my brother is sore with you, anyhow; he said you were out to the place most every day and you should have brought that stock out instead of sending it out by the lawyer.' I said, 'I have nothing to do with that.' I said, 'That is the way I will sell the stock.' I said, 'Furthermore, you know that I am obligated more than that to the Merchants National Bank, and even if I wanted to sell it for seventy-five thousand dollars I couldn't do it.' 'Well,' he said, 'he told me to give you until 12 o'clock Monday to accept that offer, or,' he said, 'it is fight.' "

The plaintiff testified that Henry Wiessner knew at that time he had borrowed money from the bank upon the stock, and further that the Wiessners had refused to transfer the stock to him and was talking of contesting the will of his wife unless he would give up the five shares, and that he so informed the bank. Mr. Vernon Cook, the counsel for the plaintiff, wrote to the Wiessners asking that arrangements be made for the transfer of the stock. After sending that letter Mr. Requardt, representing the Wiessners, called upon him and said his clients disputed the validity of the will of Mrs. Wegefarth, and, therefore, they declined to transfer the stock. He also "stated that 5 shares of the 25 which stood in the name of Margaret Wegefarth had come from the estate of her deceased brother, Fred. Wiessner, I believe, was his name, and Mr. Requardt claimed that there had always been some family understanding about that stock to the effect that it was to go to the boys, as I recall, was his claim. He also, at the same interview, made a proposition of settlement. Do you want me to go into that?

"Q. Yes. A. Well, he suggested, as I recall it, that the matter could be settled if Doctor Wegefarth would give up these five shares and if he would also give up any claim that he might have to a certain dwelling house where, I think, the Wiessners lived; that they would be willing to settle and compromise the matter in that way.

"Q. Do you mean they would abandon the idea of attacking the will? A. Yes."

On June 1, 1914, George F. and Henry F. Wiessner filed the caveat to the will of Mrs. Wegefarth, and an answer was filed by the plaintiff as executor, and on August 21, 1914, issues, involving due execution, mental incapacity, fraud and undue influence were transmitted to the Court of Common Pleas for trial. On August 19, 1914, the Brewing Company brought suit against the plaintiff on a promissory note for $8,288.00 and interest. On June 5, 1914, the plaintiff demanded for the first time a statement of the affairs of the corporation, which it refused to furnish pending the caveat. Thereupon, the plaintiff filed a petition for a mandamus to compel a statement and inspection of the books of the corporation. The defendants, whilst denying the plaintiff's right to a statement, did, however, on June 18th and June 20th, send two statements, and asked to have the petition "for mandamus dismissed, according to our understanding." In response to the letter of June 20th, transmitting the second statement, the counsel for the appellees received from Gans & Haman a letter dated June 22, 1914, in which they said: "On going over with our client the figures which the company has submitted to us in reference to the matter, we find they differ so widely from what Doctor Wegefarth had reason to expect that he has determined to insist on his right as a stockholder to have an accountant make an examination of the books of the company. Opportunity to make such an examination was asked in our petition for mandamus. Will you let us know whether the company will consent to the making of such an examination? If not, we shall have to ask you to file your demurrer or answer in the mandamus case as promptly as possible, so that the rights of the respective parties may be determined by the Court." Thereafter the appellees filed their answer to the petition for mandamus. On the 12th of August, 1914, Doctor Wegefarth authorized the bank to sell the stock for $150,000.00, and the bank offered the stock to the Wiessners at that price. At that

time the plaintiff was suffering from a severe nervous break-down, and he put his affairs in charge of his brother, Doctor Arthur Wegefarth, who went to the bank and threatened to file an injunction to prevent the sale of the stock for $150,-000.00. Mr. W. Calvin Chesnut, representing the plaintiff, went to the Bank on August 15th, and found the stock had been offered to the Wiessners for that sum, but that the offer had not been accepted. He induced the Bank to withdraw the offer. The Bank on May 19, 1914, had renewed the plaintiff's note, and by its terms it would have matured on September 19th, but under the power conferred by the collateral note it had the right to call for additional collateral, and if that was not furnished to declare the note due. On August 17th the Bank did demand additional collateral, but it was not furnished. No action, however, appears to have been taken under the demand.

On August 22, 1914, counsel for plaintiff wrote Mr. John B. Ramsay, Vice-President of the Bank, submitting the following offer of sale and settlement:

"August 22nd, 1914.

"John B. Ramsay, Esq., Vice-President,

"Merchants-Mechanics National Bank,

"South and Water Streets, City.

"Dear Mr. Ramsay:

"Pursuant to my conversation with you yesterday afternoon, I write on behalf of our client, Doctor George C. Wegefarth, to authorize you to offer twenty-five shares of stock of the Wiessner Brewing Company now held by your bank as collaetral to the note of the City and Suburban Realty Company, and belonging to Doctor George C. Wegefarth, to the Messrs. Wiessner for sale for $165,000.

"When you submit this offer to the Messrs. Wiessner or their counsel, will you please advise them that it is a condition of the offer that the caveat case filed by them against Doctor Wegefarth should be dismissed, and, of course, upon the sale of the stock, the mandamus

case heretofore filed by Doctor Wegefarth against them would also be dismissed.

"Pending the caveat, the Wiessners have withheld the payment of the customary semi-annual dividend to Doctor Wegefarth. This, of course, should be paid to him now in addition to the principal purchase price of the stock.

"As you know, Doctor Wegefarth considers that the fair and reasonable value of this stock is very greatly indeed in excess of the price at which it is now offered for sale, and that a sale at this price will be a very great financial sacrifice for him to make. He is only impelled to submit the sale of stock at this very low price by reason of his present poor condition of health, which renders it important for him to close up, so far as possible, his financial and business affairs for the time being. He is also actuated by a desire to facilitate the liquidation of the note held by your bank.

"It is important, therefore, in order to meet the reasons actuating him in offering the stock for sale, that the offer made should be promptly accepted. Will you therefore please explain to the Messrs. Wiessner or their counsel, when you submit the offer, that it is not to remain open indefinitely, but if accepted must be within a reasonably short time, say two or three days after you have communicated it to them.

"Yours very truly,

" 'E'                    (Signed)   Calvin Chesnut."

After some negotiations between the parties, acting through their respective counsel and the Bank, an agreement of settlement under seal, dated September 22, 1914, was entered into, which in substance provided as follows:

First—That the plaintiff agreed to sell to George F. and Henry F. Wiessner the said 25 shares of stock for the sum of $160,000.00 cash, and in addition thereto and as a part of said purchase price, that the Wiessners should satisfy, pay and discharge to the Brewing Company the indebtedness evidenced by the promissory note of the plaintiff for $8,288.00 upon which

suit had been brought, and that said note should be surrendered to the plaintiff;

Second—That the caveat proceedings be dismissed and that George F. and Henry F. Wiessner "do hereby release and assign unto the said George C. Wegefarth any and all claim which they now have or claim to have against the estate of said Margaret Wegefarth, or the said George C. Wegefarth as executor thereof, or legatee under said will, and agree that said dismissal of said caveat and release and assignment of claim as herein mentioned shall be a perpetual bar to any future assertion of any claim of any character by them as next of kin, heirs at law, or distributees, in and to the assets of the estate of Margaret Wegefarth, and that no further caveat shall hereafter be filed by them against said will.

"The dismissal of said caveat case shall be made in such form and manner as counsel for the respective parties may advise to be most efficacious to legally and conclusively establish the validity of said will of the said Margaret Wegefarth, and preclude any future attack thereon by anyone. The said George F. and Henry F. Wiessner agree to pay the costs of said caveat proceeding";

Third—That the petition for mandamus be dismissed, the costs to be paid by the petitioner;

Fourth—The dismissal of the suit upon the promissory note mentioned, and the surrender of said note as paid and cancelled to the plaintiff herein, the Brewing Company to pay the costs;

Fifth—That the plaintiff should transfer to George F. and Henry F. Wiessner, "all his remaining right, title and interest in and to the 'undistributed' estate of his late father-in-law, J. Fred Wiessner, Sr., and his late brother-in-law, J. Fred Wiessner, Jr., late of Baltimore City, deceased, and will execute such further acts and deeds as may be necessary to more effectually consummate said transfer and assignment."

Pursuant to this agreement George F. and Henry F. Wiessner paid $160,000.00 cash for the stock, and it was turned over to them, and in addition thereto the suit of the Brewing Company against George C. Wegefarth upon the promissory note referred to above was entered, agreed and settled, and the note delivered to the plaintiff herein. On October 13, 1914, a jury in the Court of Common Pleas, sworn to try the issues in the *Caveat case,* found a verdict in favor of the defendant on all the issues, thereby establishing the validity of the will of Mrs. Wegefarth. The record of proceedings in the case was transmitted to the Orphans' Court of Baltimore City, and that Court on the 14th day of October, 1914, adjudged and decreed "that the paper writing dated June 4, 1909, purporting to be the last will and testament of Margaret Wegefarth, late of Baltimore City, deceased, is the true and genuine last will and testament of the said Margaret Wegefarth, late of Baltimore City, deceased, and that the petition and caveat heretofore filed in this cause, be and the same is hereby dismissed, and that the probate of said will and letters testamentary thereunder, be and the same remain in full force and effect." The costs of the proceedings were paid by the caveators. The petition for mandamus was dismissed and the costs paid by the petitioner, and on the 18th of September, 1914, Doctor Wegefarth executed and delivered to George F. and Henry F. Wiessner a deed for all his interest in the property mentioned in the fifth clause of the agreement. On September 18, 1914, George C. Wegefarth, executor of Margaret Wegefarth, executed, acknowledged and delivered to George F. and Henry F. Wiessner and the John F. Wiessner & Sons Brewing Company a release under seal. This release recited that certain controversies had arisen between the parties, and that a full settlement had been made between them, and that the legal actions which had arisen thereout had been dismissed, and that the settlement so made was intended to put an end to any claim or suit whatsoever which the said executor might have against the said parties. Therefore

"in consideration of the premises and one dollar, the
said George C. Wegefarth, executor as aforesaid, doth
hereby release, acquit, exonerate and discharge the said
John F. Wiessner & Sons Brewing Company and
George F. Wiessner and Henry F. Wiessner, its and
their respective successors, heirs, executors and admin-
istrators, of and from all and every action, suit, claim
or demand which could or might possibly be brought,
exhibited or prosecuted against it, them, or any of
them, for and on account of any matter or claim what-
soever; the said George C. Wegefarth, executor as
aforesaid, hereby declaring himself fully satisfied, con-
tented and paid."

There is no legally sufficient evidence to support the allega-
tions that the defendants by threats made to the bank de-
stroyed his credit and induced it to call his loan. Under the
well settled law of this State no damages can be predicated
of the filing of the caveat to the will of Mrs. Wegefarth, even
if it be conceded that that caveat was filed maliciously and
without probable cause. *McNamee* v. *Minke,* 49 Md. 122;
*Supreme Lodge* v. *Unverzagt,* 76 Md. 104; *Bartlett* v. *Christ-
hilf,* 69 Md. 219; *Rieger & Co.* v. *Knight,* 128 Md. 189.

It is obvious, we think, that the plaintiff can in no event
recover in this case without showing that the settlement and
release were secured by fraud. This charge is made in each
count of the declaration, and is alleged to consist in the false
and fraudulent statements made to the plaintiff as to the
financial condition of the defendant corporation. It is al-
leged in the first count of the declaration "that said state-
ments were untrue and false, and that the defendants did not
believe the statements to be true, and that they had actual
knowledge of the falsity of the representations therein made,
together with a reckless indifference as to their truth, and fur-
ther, that the falsity of said statements was so material that
had the false entries thereon not been made, but the true ones
inserted, the sale of said stock by the plaintiff to the defend-
ants would not have been made, because a true statement of

the condition of The John F. Wiessner & Sons Brewing Company, the defendant, would show assets of about $1,500,000, instead of assets in said statements rendered of $879,873.34 as of the date thereof, all of which the plaintiff but recently discovered; that the plaintiff, relying and believing altogether and exclusively on the truth of said statements so given him as to the true value of said stock, and which were given to him as hereinbefore set forth for the purpose of influencing him in the sale of said stock at a figure much below its true value, was induced thereby and did, on the 19th day of September, 1914, sell and transfer, through the Merchants-Mechanics National Bank, to the said defendants the aforesaid twenty-five shares of stock of the said defendant corporation." This charge is in substance repeated in each of the other counts. In *Hammond* v. *N. Y., P., N. R. R. Co.,* 128 Md. 442, JUDGE BRISCOE said: "It is well settled law, that evidence of fraud to warrant a Court in submitting a case to the jury as to the invalidity of an instrument under seal must be clear, direct and satisfactory. In *Pa. R. R. Co.* v. *Shay,* 82 Pa. St. 198, a somewhat similar case, MR. JUSTICE SHARSWOOD said: 'It has been more than once held that it is error to submit a question of fraud to the jury upon slight parol evidence to overturn a written instrument. The evidence of fraud must be clear, precise and indubitable otherwise it should be withdrawn from the jury. *Stine* v. *Sherk,* 1 W. & S. 195; *Dean* v. *Fuller,* 4 Wright (Pa.) 474; *Irvin* v. *Shoemaker,* 8 W. & S. 75.' In *Duvall* v. *Coale,* 1 Md. Ch. 168, it is said, that deliberate settlements and solemn instruments are not to be impeached and overthrown by light and trivial circumstances, which at most furnish a foundation for ingenious minds to speculate upon and to weave plausible theories of unfairness in the transaction with which they are associated."

If the plaintiff did not believe the statements as to the financial condition of the corporation to be true, it is quite clear that he cannot impeach the settlement upon the ground that those statements were false and fraudulent. *McAleer* v.

*Horsey,* 35 Md. 439; *Boulden* v. *Stilwell,* 100 Md. 543; *Reynolds* v. *Evans,* 123 Md. 365; *Lucas* v. *Long,* 125 Md. 420.

It was said in the last cited case that "the fraud must work an actual injury to the party complaining, and it must appear that he not only did in fact rely upon the fraudulent statement, but had a right to rely upon it in the full belief of its truth, for otherwise it was his own folly or fault, and he cannot ask of the Court to relieve him from the consequences." The law will not permit one to predicate damage upon a statement which he did not believe to be true.

A brief reference to the more prominent facts adduced to support the charge of fraud will show that they are legally insufficient under the principles stated to support it. Both of these alleged fraudulent statements were in the possession of the plaintiff on the 20th of June, 1914, and the letter of Gans & Haman of June 22nd indicates plainly that the plaintiff did not accept these statements as true. Again, the proposition of settlement came from the plaintiff through his counsel, Mr. Chesnut, in his letter to the bank dated August 22, 1914, already referred to. In this letter it is stated that "Doctor Wegefarth considers the fair and reasonable value of the stock is very greatly indeed in excess of the price at which it is now offered for sale." And Doctor Wegefarth testified that he doubted the statements, and when asked if he relied upon the statements that the net assets of the John F. Wiessner & Sons Brewing Company were $870,873.04 and no more,—that being the net assets shown by both statements,—was correct, said: "I did not believe anything of the kind, as far as that is concerned." This evidence relating to the question of fraud is undisputed, and under the settled law of this State precludes a recovery on that ground.

Mr. Chesnut who, as counsel for Doctor Wegefarth, drew the agreement of settlement, testified: "That it was the understanding all around, as I remember it, that everything should be settled and disposed of and no open issue or controversy of any kind should be left standing." We do not find it necessary to discuss the testimnoy of Mr. Ramsay and

Mr. Ingle as to the negotiations which led to the settlement. Their testimony corroborates that of Mr. Chesnut, and shows that no pressure or influence of any kind was exerted upon the Bank by the Wiessners.

At the time the settlement was made Doctor Wegefarth was undoubtedly in a desperate financial situation, but we do not find that it was a condition chargeable to the defendants. Mr. Ingle, testifying to the efforts of the Bank to sell the stock to the Wiessners, said: "We had gotten Mr. Wiessner to come across in steps, started him with $75,000—I have forgotten the successive steps—until he probably had gotten up to a place certainly short of $160,000, or we would have closed at that figure. That was obvious. So the state had been reached in which neither would concede * * * we were in council with Doctor Wegefarth, I imagine—I am sure—most of the time, and reported back to him the best we were able to do with Mr. Wiessner, and Doctor Wegefarth would shake his head and say, 'Not enough; won't think of it,' and so on; but at last the time came when we got Mr. Wiessner to pay $168,000, and instead of Doctor Wegefarth shaking his head one way he shook it the other and we got the $168,000, and we thought he was awfully happy—we were, I assure you—because we returned him back $30,000 in real money." He further said that, being minority stock in a private industrial corporation, "there was not but one place for this stock to fall and that was in the hands of the majority owners. You would not have given anybody on earth $5,000 for it as an investment."

During the course of the trial certain exceptions were reserved by the plaintiff to rulings on evidence. In view of our holding that the plaintiff offered no legally sufficient evidence to impeach the legal force and effect of the agreement of settlement, it must be apparent that the character of evidence embraced in the exceptions would not change our conclusion. It is, therefore, unnecessary to prolong this opinion by discussing the exceptions.

*Judgment affirmed, with costs.*