## NORTH POINT CONSTRUCTION CO. v. LOUIS J. SAGNER ET AL.

[No. 12, October Term, 1945.]

*Decided November 2, 1945.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, HENDERSON, and MARKELL, JJ.

*Eldridge Hood Young*, with whom were *Lemuel Oliver* and *Albert A. Sapero* on the brief, for appellant.

*Enos S. Stockbridge* and *Symone S. Spector*, with whom were *Solomon Hirschborn* and *Frederick H. Hennighausen* on the brief, for appellees.

MELVIN, J., delivered the opinion of the Court.

This is an action at law for the malicious prosecution of a civil suit. At the conclusion of the plaintiff's case the trial court granted defendants' motion for a directed verdict, and from the judgment on that verdict the plaintiff has appealed.

The appellant is a corporation formed in April, 1941, for the purpose of constructing, and then selling, thirty-six houses on a tract of land which it owned on Gough Street in Baltimore County, adjacent to the city limits. The promoter of that enterprise and the directing head of the corporation was Earl W. Powers who, with his wife, owned practically all of its capital stock. They also then owned and controlled another corporation named "University Building Corporation," which was engaged in developing similar building projects on "Pioneer Drive" and on "Northern Parkway" in Baltimore City.

Shortly after the North Point Construction Company (appellant) was organized, Mr. Powers caused to be transferred to it certain of the lots and houses in the two developments just named. He also, as of June 24,

1941, caused to be placed, through a local building association, four construction mortgages in the amount of $29,700 on each of four sections of nine lots and houses thereon into which this project had been divided.

In January, 1942, there was an accumulation of bills due by both of the Powers corporations, "University" and "North Point," for labor and materials furnished for these construction jobs, the largest creditor being Robert S. Green, Inc., hereinafter called "Green." Its claim against Mr. and Mrs. Powers "for materials and supplies delivered heretofore (at the direction of Powers) to the University Bldg. Corp." was in the amount of $15,000, more or less, and its claim against the North Point Construction Company amounted to $11,000, more or less. There were numerous other creditors for labor and material which had been furnished on these projects at the instance of Mr. Powers, as the directing head and practical owner of both corporations, but their aggregate amount did not exceed $3,000.

In this situation the attorney for the "Green" corporation, Albert A. Sapero of the Baltimore Bar, prepared a formal written agreement under date of January 26, 1942, between the North Point Construction Company, Earl W. Powers and Ethel M. Powers, his wife, as parties of the first part, and Robert S. Green, Inc., and Albert A. Sapero, agent for Robert S. Green, Inc., as parties of the second part. After reciting the above-mentioned claim of $15,000 on account of the University Building Corporation and $11,000 claimed to be due by the North Point Construction Company, the agreement calls for the transfer of the latter corporation's property and assets, including "all monies of whatever nature * * * emanating from the proceeds of sale of any of its property, ground rents, mortgages, construction loan advances, and assets of whatever nature, to Albert A. Sapero, Agent." Green and Sapero, on their part, agreed, among other things, to pay labor and material bills within their discretion "provided the same be approved by Albert A. Sapero, Agent." As a part of the consideration "Green"

agreed to release its claim against Mr. and Mrs. Powers for materials and supplies delivered to the University Building Corporation in the amount of $15,000. As to the Gough Street property, Green and Sapero, as agent, agreed to "advance sums of money within their discretion during the construction of thirty-six houses by the North Point Construction Company."

Under date of February 11, 1942, the majority stock holdings in that corporation were acquired by Robert S. Green, and from that time on Sapero had the active management of the corporation. According to his testimony, when he and "Green" entered into this agreement of January 26, 1942, they considered their claim of $11,000 against the North Point Construction Company "uncollectible," and they "abandoned that claim because they were satisfied that they controlled the stock of the Company so if there was any profit in the Company—not any profits but anything in the Company—they would get it in the form of their stock."

On March 5, 1942, "Green" and Sapero tightened even further their hold on "North Point" by the latter corporation's execution of a mortgage (prepared by Sapero) to "Green" on the Gough Street properties in the amount of $16,000. By this time, under Sapero's direction, the North Point Construction Company had been stripped of all its property and assets that might have been available otherwise to the general creditors of Powers and his corporations, and complete dominion and control given to "Green." Moreover, according to the written agreement, Sapero had placed in himself, as agent, absolute veto power over the payment of any and all bills for labor and material in connection with these building projects.

It is thus to be noted that Mr. Sapero's first appearance in the picture in the instant case was as attorney for one of the creditors (the largest) of a debtor corporation, and that his next appearance, almost immediately, was in the joint role of officer and manager of that debtor and of general counsel and agent for the creditor, at the same time and for the same operation.

It was in this situation that the other creditors of "North Point,"—those who had also furnished labor and materials for the Powers projects, found difficulty in getting their own accounts paid. They appealed to Mr. Powers, with whom, like Green, they had had their original dealings, and under date of April 9, 1945, he wrote a letter calling a meeting of the creditors to be held on April 11th, at the office of Louis J. Sagner, of the Baltimore Bar, one of the appellees here. Mr. Sagner was then representing a creditor of the North Point Company who had been referred to him by Mr. Powers' attorney, William L. K. Barrett, also of the Baltimore Bar, because the latter "didn't feel like he should represent a creditor trying to collect from somebody and representing the North Point, too." The agreement of January 26, 1942, was called to the attention of Mr. Sagner at or about the time the claims of the appellees were placed in his hands for collection, and before the letter of April 9, 1942, was sent out.

In response to this letter from Mr. Powers, the meeting was held in Mr. Sagner's office at the appointed time and was attended by all four of the appellees, namely, by Mr. Sagner and his three clients hereinafter named, as well as by some other creditors. It was Mr. Powers' position, as testified by him, that when the agreement of January 6, 1942, was entered into, Sapero and Green undertook and agreed to pay the bills in question. As expressed by Mr. Powers, "that letter (April 9, 1942) was written in an effort to explain to the creditors that when I transferred it (the North Point assets) to Robert S. Green, it was done on the strict understanding, a definite promise by Mr. Sapero and Mr. Wheeler of the Robert S. Green Company, that all of those bills would be paid and the men would have no trouble getting their money."

It developed that "the men," including the three appellees-creditors, did have trouble, that Mr. Sapero resisted payment of the bills as submitted, and that he undertook to effect a compromise settlement directly with one of them (Weimeister) although he knew that

the claim was then in the hands of Mr. Sagner. The net result of all these negotiations and of the stripping of the debtor corporation of all of its assets in favor of one of the creditors (Green) against all the others, was the filing on April 24, 1942, of a bill of complaint for a receiver for the North Point Construction Company. The plaintiffs were Weimeister, Hammer and Clopein, and the solicitors who signed and filed the bill were Mr. Sagner and also Mr. Enos S. Stockbridge, of the Baltimore Bar.

No order of any kind was passed on this bill, and no final court action taken, so far as shown by the record. The three claimants did, immediately thereafter, file their claims in a court of law and, under date of November 6, 1942, all of the claims were settled on the basis of a reduced amount to each one of them. Green and Sapero had previously resisted settlement on the ground that the claims were incorrect, either in amount or as to the liability of the North Point Construction Company as debtor.

After this settlement of the three claims had taken place, the North Point Construction Company, still owned by Green and operated by Sapero as agent, brought the instant suit for malicious prosecution, naming as defendants not only the three claimants, Weimeister, Hammer and Clopein, but also naming one of their attorneys (Mr. Sagner) but not the other (Mr. Stockbridge). There are two counts in the declaration, the first for "instituting falsely, without cause, and maliciously, a suit for a receiver," etc., to collect certain allegedly excessive claims, and the second for "conspiracy" for the same purpose. The case was tried before the court and jury under general issue pleas, and at the conclusion of the plaintiff's case the court granted the defendants' prayer for an instructed verdict.

In dealing with this kind of an action, certain well-established principles of law are to be considered, for they govern the decision here. These are:

(1) Suits for malicious prosecution are viewed with disfavor in law and are to be carefully guarded against.

*Owens v. Graetzel,* 149 Md. 689, 132 A. 265; *Slee v. Simpson,* 91 Colo. 461, 15 P. 2d 1084, 85 A. L. R. 412, 413; *Newell, Malicious Prosecution,* 21; *Texas Law Review,* Vol. 15, p. 169.

(2) The burden is upon the plaintiff to prove that, among other elements, the prosecution complained of was without "probable cause," and unless that burden be met there can be no recovery. *Goldstein v. Rau,* 147 Md. 6, 127 A. 488; *Jordan v. James & Holstrom Piano Co.,* 140 Md. 207, 117 A. 366; *Cooley on Torts,* 4th Ed., Vol. 1, 130; *Restatement—Torts,* Vol. 3, p. 444.

(3) Whether the evidence in any given case is legally sufficient to show want of probable cause is a question of law. *Goldstein v. Rau, supra; Jordan v. James & Holstrom Piano Co., supra; Thelin v. Dorsey,* 59 Md. 539.

(4) Regardless of the attitude of the courts of other jurisdictions, concerning which there is much conflict, and regardless of the contrary view indicated in *Restatement—Torts,* Vol. 3, page 442, Maryland has steadfastly adhered to the so-called "English" rule that no action will lie for the malicious prosecution of a civil suit when there has been no arrest of the person, no seizure of the property of the defendant, and no special injury sustained which would not ordinarily result in all suits prosecuted for like causes of action. *McNamee v. Minke,* 49 Md. 122; *Supreme Lodge, etc. v. Unverzagt,* 76 Md. 104, 24 A. 323; *Bartlett v. Christhilf,* 69 Md. 219, 14 A. 518; *Reiger & Co. v. Knight,* 128 Md. 189, 97 A. 358, L. R. A. 1916E, 1277; *Wegefarth v. Wiessner,* 134 Md. 555, 107 A. 364, 6 A. L. R. 396; *Owens v. Graetzel, supra.*

(5) The mere expense and annoyance of defending a civil action is not a sufficient special damage or injury to sustain an action for malicious prosecution. *Owens v. Graetzel, supra; Bartlett v. Christhilf, supra; Gore v. Condon,* 87 Md. 368, 39 A. 1042, 40 L. R. A. 382, 67 Am. St. Rep. 352; *Wilmer v. Placide,* 137 Md. 107, 111 A. 822; *Schwartz v. Schwartz,* 366 Ill. 247, 8 N. E. 2d 668, 112 A. L. R. 325; 150 *A. L. R.* 897, 898. To the contrary is *Restatement, supra,* page 462.

(6) In a civil action, it is enough that an attorney at law who acts in good faith in presenting and prosecuting a claim for his client, had reasonable ground to believe that his client had a good case. As stated by Mr. Justice Bradley in *Campbell v. Brown,* 4 Fed. Cas. page 1158, No. 2, 355, 2 Woods, 350: "If attorneys cannot act and advise freely, and without constant fear of being harassed by suits and actions at law, parties could not obtain their legal rights." *Peck v. Chouteau,* 91 Mo. 138, 3 S. W. 577, 60 Am. Rep. 236; *Newell, Malicious Prosecution,* page 26. This applies to both attorney and client for, "in determining probable cause for initiation of civil proceedings, all that is necessary is that the plaintiff reasonably believe that there is a chance that his claim may be held valid upon adjudication." *Restatement—Torts,* Vol. 3, page 449.

(7) In order to support a suit for malicious prosecution on the ground of conspiracy between attorney and client, the burden is upon the plaintiff to show such act or acts as amount to a lack of probable cause and an agreement to bring an action understood by both attorney and client to be groundless, and brought as such. "The gist of the civil action for conspiracy is the act or acts committed in pursuance thereof—the damage, not the conspiracy or the combination." 11 *Am. Jur.,* Sec. 45, page 577. It is equally essential that the plaintiff in a suit for malicious prosecution show some actionable legal damage by some overt act done in pursuance of the conspiracy, otherwise he cannot recover. *Kimball v. Harman,* 34 Md. 409, 6 Am. Rep. 340.

From the aforegoing summary of facts and of the well-established principles of law applicable to them, one issue which emerges as a decisive and controlling one on this appeal is whether the appellant established that there was an absence of probable cause in the institution of the receivership proceedings on April 24, 1942.

"Probable cause" in a civil action has been defined by this Court to be "a reasonable ground for belief in the existence of such a state of facts as would warrant in-

stitution of the suit or proceedings complained of." *Owens v. Graetzel, supra* [149 Md. 689, 132 A. 267]; *Jordan v. James & Holstrom Piano Co., supra; Supreme Lodge, etc. v. Unverzagt, supra.*

The state of facts which actually confronted the appellees at the time in question showed a debtor corporation which had been completely taken over by its largest unsecured creditor and placed under the absolute dominion, control and ownership of that creditor, to the exclusion of all hope of recovery of their claims by the other creditors. The attorney and agent of this absorbing creditor had prepared an agreement between his said client and the debtor, giving himself the veto power over the claims of all other creditors, in pursuance of which agreement also he became the treasurer and directing head of the debtor corporation. He was thus representing two conflicting interests, debtor and creditor, at the same time, and moreover, a few weeks later, had prepared and caused to be executed to his client (Green) a second mortgage of $16,000 behind the four construction mortgages.

It was apparent from this state of facts that, even if these other creditors (among whom were the appellees in this case) had filed suits at law and recovered judgment against this debtor corporation, there could have been no recovery on these judgments without first nullifying the preferential acts which had withdrawn all assets of this debtor from the common creditors. It was the kind of factual situation which not only justified the alarm of these creditors and their attorneys and warranted them in seeking the protection aid of equity, but one which called for the firm action of the trial court in withdrawing the instant case from the jury.

The appellant having signally failed to meet the burden of proof upon it to establish lack of probable cause, and this being an element indispensable to its recovery, the action of the court below in granting the prayer for a directed verdict in favor of the appellees will be affirmed.

*Judgment affirmed, with costs.*