JAMES F. HEARING ET AL. *v.* CITIZENS BAND AND TRUST COMPANY

[No. 398, September Term, 1973.]

*Decided June 13, 1974.*

The cause was argued before MORTON, MOYLAN and MOORE, JJ.

*John J. Pyne,* with whom were *McChesney & Pyne* on the brief, for appellants.

*Robert L. Burchett* and *Francis J. Ford* for appellee.

MOYLAN, J., delivered the opinion of the Court.

On December 23, 1969, the Citizens Bank and Trust Company, the appellee, through its attorney, instituted confessed judgment proceedings in the Circuit Court for Prince George's County on two demand notes held by the Bank against Lyle E. DeWees, James F. Herring, and Worth W. Offutt, the appellants. Judgment was entered on December 30, 1969. As a result of the institution of that action, the appellants (Lyle E. DeWees and James F. Herring, jointly, and Worth W. Offutt, individually) filed suits against the Bank alleging 1) malicious use of process, 2) abuse of civil process, and 3) business defamation.

The cases were removed to the Circuit Court for Calvert County and consolidated for trial. At the close of the plaintiffs' case, a directed verdict was granted in favor of the defendant as to the business defamation count. At the conclusion of the defendant's case, a directed verdict was

granted in favor of the defendant on the second count alleging abuse of civil process. The jury returned a verdict in favor of the plaintiffs on the malicious use of process count, awarding to Lyle E. DeWees compensatory damages in the amount of $39,000 and punitive damages in the amount of $30,000; to James F. Herring, compensatory damages in the amount of $21,000 and punitive damages in the amount of $30,000; and to Worth W. Offutt, compensatory damages in the amount of $29,000 and punitive damages in the amount of $30,000.

A motion for judgment n.o.v. or, in the alternative, a motion for a new trial was filed by the defendant-appellee. After a hearing, the judgment n.o.v. was granted, and judgment was entered in favor of the defendant. The court further ruled that if judgment were to be reinstated upon appeal, the court would grant the motion for new trial unless the plaintiff DeWees agree to a remittitur of the compensatory damages in excess of $7,500; the plaintiff Herring, to a remittitur of compensatory damages in excess of $2,000; and the plaintiff Offutt, to a remittitur of compensatory damages in excess of $5,000; and further that all plaintiffs agree to a complete remittitur of punitive damages.

On appeal, the plaintiffs-appellants raise four contentions:

1) That the trial court erred in granting defendant's motion for a directed verdict on the count of business defamation;

2) That the trial court erred in granting defendant's motion for a directed verdict on the count of abuse of civil process;

3) That the trial court erred in granting judgment n.o.v. because the evidence in the case was sufficient to support the jury's verdict on the count of malicious use of process; and

4) That the trial court abused its discretion in conditionally granting remittitur or, in the alternative, a new trial.

## The Facts of the Case

The facts underlying the institution of confessed judgment proceedings are a tangled skein. The object of all the complicated legal transactions is a tract of land, known as "the Spencer tract," situated in Prince George's County. The first relevant transaction for present purposes was on March 13, 1956, when Maude B. Eslocker and her husband sold the property to S. Aubrey Spencer for an indicated price of $65,000. On that same day, Spencer executed a deed of trust[1] for the benefit of Maude B. Eslocker (hereinafter the Eslocker mortgage), evidenced by a promissory note for $45,000.

On May 31, 1963, Spencer and his wife conveyed the property to Lyle E. DeWees and Robert H. Law, as joint tenants, for an indicated price of $100,000. On that same day, DeWees and Law executed a mortgage to Spencer and his wife (hereinafter the Spencer mortgage), evidenced by a promissory note for $48,568.70. Then on June 5, 1963, DeWees and Law, in turn, conveyed the property to T. D. Burgess and wife and Frank G. Principe and wife. Under a Joint Venture Agreement, dated June 4, 1963, the title was to be held for the benefit of Lyle C. DeWees, Oscar R. Duley, T. D. Burgess and Frank G. Principe. Upon Duley's death, James Herring and Worth W. Offutt (the two appellants along with the appellant DeWees) purchased his interest.

Three years later, on April 1, 1966, three of the joint venturers (and the wives of two of them) determined to redeem the property from its encumbrances. On that date, Lyle C. DeWees and wife, James Herring and wife and Worth W. Offutt borrowed $18,614.52 upon a demand note from the defendant Citizens Bank. With this, they purchased "the Eslocker mortgage" from its holder. This deed of trust was then endorsed in blank and delivered to the

---

1. Deeds of trust are apparently widely used in place of mortgages as security devices in Montgomery and Prince George's counties. The few decisions of the Court of Appeals have treated deeds of trust like mortgages for some purposes, but have placed them in a separate category for other purposes. See *LeBrun v. Prosise*, 197 Md. 466, 79 A. 2d 543; *Manor Coal Co. v. Beckman*, 151 Md. 102, 115-116, 133 A. 893; *Lewis v. Beale*, 162 Md. 18, 20, 158 A. 354; *Billingsley v. Mitchell*, 257 Md. 301, 262 A. 2d 746.

defendant Bank by the borrowers as collateral security for the demand loan.

The same borrowers, on June 9, 1966, undertook to accomplish the same redemption with respect to the Spencer mortgage. They borrowed $40,882.82 from the Citizens Bank and with it purchased the Spencer mortgage note from its holder. That mortgage note was then endorsed in blank and delivered to the Bank by the borrowers as collateral security for the demand loan. As of the dates of these two loans by the Bank, both of the collateral notes (the Eslocker deed of trust and the Spencer mortgage) were past due, and, at the option of the holder, the entire balances were due and payable.

In early 1968, disagreement broke out among the joint venturers and resulted in litigation. An action was filed by the joint venturers requesting the appointment of trustees to oversee the sale of the Spencer tract and to assure the proper distribution of the proceeds among the joint venturers and their just creditors. By a court order of June 5, 1969, Hal C. B. Clagett and Thomas B. Yewell were appointed trustees. As early as March 11, 1968, Yewell, then acting as attorney for DeWees, wrote to the Citizens Bank about the pending litigation and gave his legal opinion that since the notes held by the Bank as collateral security were secured by encumbrances against the property, they would be priority claims against the proceeds of the sale of the property.

In April, 1969, the joint venture having failed to pay taxes due on the property, Prince George's County was preparing tax foreclosure proceedings. On April 17, 1969, the Bank, in writing, demanded payment on the two demand notes. On April 24, 1969, the Bank retained C. Edward Hartman, II, to enforce the payment of the money owed the Bank.

Although payments on the demand notes had been made regularly through April, 1969, the Bank refused the tender of the May payment since it had already made demand for full payment. On May 5, 1969, Hartman informed Yewell that the Bank wanted payment on the demand notes and that it was the Bank's intention to foreclose on the two

mortgages if full payment was not immediately forthcoming. Yewell asked Hartman to forebear from such actions because 1) a foreclosure sale would deprive him of the sale commission he would get if the property were sold through the equity proceeding and 2) he (Yewell) thought that a sale through the equity proceeding would bring a higher price. Hartman replied that he would take no further action without notifying Yewell.

On May 20, 1969, the Bank filed a petition reciting that the Eslocker mortgage was in default, that the Bank was about to begin foreclosure on the deed of trust and asking that Ronald Council be appointed trustee for the purpose of such foreclosure. Meanwhile, Yewell and Clagett had been appointed on June 5 as trustees to sell the property. Knowing that this decree was being prepared, Hartman had asked that the decree include a paragraph specifying that both the deed of trust and the second mortgage held by Citizens Bank be paid from the sale proceeds as priority items. The decree, prepared by Yewell, made no mention of the Bank's priority claim.

On June 6, 1969, the day after the appointment of the trustees, the Bank was permitted to intervene in the equity proceeding, seeking a clarification of the decree. By a petition filed on June 7, the Bank recited that it held the two demand notes together with the deed of trust and the second mortgage, that they were in default and that if the property was to be sold free and clear of the mortgages that the Bank might lose the land which was its security on the demand notes. The Bank also petitioned the court to instruct the trustees to pay in full the two collateral notes, if the property were to be sold free and clear of the liens.

On September 26, 1969, the Spencer tract was sold by the trustees for $200,000, free and clear of all liens. The advertisements for the sale recited that the property was "to be sold free and clear of all encumbrances."

On September 30, 1969, Hartman sent Yewell a sheet showing the balance due on all the notes and asking the date of settlement in order to appear, collect the Bank's money, and reassign the liens and notes. On October 7, Yewell

replied, stating that a verified claim should be filed and notifying Hartman that the trustees would disburse the amount due to the Bank upon ratification of the sale and audit. On October 14, the Bank filed the verified claim, seeking payment of $69,004.02. This represented the face value of the two mortgages. From it the Bank desired to pay the amount due on the two demand notes ($51,649.21) plus something in excess of $5,300 in attorney's fees plus an extra cushion to be returned to the trustees after the Bank made its disbursements.

On December 11, 1969, Yewell wrote Hartman that both trustees and the auditor were in agreement that the claim, as based on the collateral notes, could not be paid and called for the Bank to submit its claim based on the judgment notes and "surrender with the claim the notes held as collateral security. Then, when Citizens Bank . . . has been paid, the collateral security notes could be marked 'paid,' and the property could be released from the force and effect of the encumbrances securing the payment of those notes." Yewell had notified Hartman by telephone that he thought the claimed attorney's fee of $5,300 was excessive. He indicated that as DeWees's attorney, he would object; but that as trustee, he would pay whatever the court allowed.

Prior to December 11, Yewell had had two or three conversations with Hartman and a conference before the auditor, in each of which he repeated his position that the claim was improper. Yewell testified that during this period, things were getting disagreeable between himself and Hartman. He testified that Hartman said he was going to reduce the notes to judgment, if Yewell did not agree in advance to the $5,300 attorney's fee.

On December 16, Hartman wrote to both trustees, reciting the execution of the notes, the assignment of the liens and quoting Yewell's legal opinion of March 11, 1968. He referred in the letter to the fact that he had been induced to forebear foreclosing the liens by Yewell's request that the trustees be permitted to sell. He recited that he followed Yewell's advice and filed the claim based upon the collateral notes. Yewell replied, on December 19, that in his opinion the Bank should

never have referred the case to an attorney and was not, therefore, entitled to be reimbursed for attorney's fees in any amount. He stated that any claim that included attorney's fees would be rejected.

On December 22, Hartman responded that if the trustees would not pay the claim filed by the Bank, he would recommend that the Bank pursue any legal remedy available to insure payment. Accordingly, Hartman mailed to the clerk of the Circuit Court for Prince George's County, on December 23, Declarations and the Confessions of Judgment on the two demand notes. Judgment was entered on December 30, 1969.

On December 24, the trustees filed a Petition for Rule to Show Cause, ordering the defendant Bank to show cause why it should not file a verified claim based on the demand notes. A copy of such Petition and Order to Show Cause was received by Hartman on December 29.

Meanwhile, on January 12, 1970, the appellants received notice of the entry of judgment on the confessed judgment notes. On January 27, a hearing was held on the Rule to Show Cause. The trustees were ordered to pay that sum due on the demand notes, $51,649.21, plus interest. The trustees were also ordered to pay attorney's fees in the amount of $1500. The judgments were marked paid and satisfied.

The common denominator claim of all appellants, running through the various charges, is that the filing of the confessed judgment notes was unnecessary and malicious and resulted in injury to the credit ratings of the appellants and injury to their personal and business reputations. Based upon the institution of the confessed judgment actions by the Bank, the appellants filed suit, alleging 1) malicious use of process, 2) abuse of civil process and 3) business defamation.

### Business Defamation

In urging that the institution of the confessed judgment proceedings constituted that sub-variety of libel [2] known as

---

2. It is also a sub-variety of slander.

business defamation, the appellants candidly acknowledge that there is no authority in Maryland supporting that position. They attempt to reason from analogy. They rely on *M & S Furniture Sales Co. v. Edward J. DeBartolo Corp.*, 249 Md. 540, 241 A. 2d 126, for the not-to-be-doubted proposition that actions and conduct, as well as printed or spoken words, can be actionable, and for the further proposition that whether or not a cause is actionable *per se* or *per quod* lies in the proof of the resulting injury. They further rely on *DeWitt v. Scarlett*, 113 Md. 47, 77 A. 271, for the general proposition that defamation denoting a poor credit rating, without justification, is actionable *per se*. By combining these two cases, appellants urge that the defendant Bank's conduct in initiating confessed judgment actions necessarily denoted a poor credit rating on the part of the appellants and was, therefore, actionable *per se*.

They totally ignore the controlling principle that communications made with respect to judicial proceedings are accorded an absolute privilege. Completely dispositive of the charge of business defamation, based exclusively on the institution of confessed judgment proceedings, is *Kennedy v. Cannon*, 229 Md. 92, 96-97, 182 A. 2d 54:

> "The statement just quoted [from *Maulsby v. Reifsnider*, 69 Md. 143, 151, 14 A. 505 (1888), to the effect that defamatory words spoken by counsel 'in a judicial proceeding' are privileged] reflects the view of a majority of the jurisdictions in this country, although the semantics in this area of tort law have changed somewhat since the date of the *Maulsby* case. What was characterized in that case as a qualified privilege for communications, conditioned on their being pertinent or relevant to a judicial proceeding, without regard to the motive of the speaker, is referred to by modern text writers and in case law as an absolute privilege. See, for example, *Brush-Moore Newsp. v. Pollitt*, 220 Md. 132, 137, 151 A. 2d 530 (1959); *Sanders v. Leeson Air Conditioning Corporation*, 108 N.W.2d 761 (Mich. 1961); *Ramstead v. Morgan*, 347 P. 2d 594 (Ore.

1959); *Bailey v. McGill*, 100 S.E.2d 860 (N.C. 1957); *Prosser, Torts* (2nd ed.), pp. 606, *et seq.*; 69 Harv. L. Rev. 875, 920. *This absolute immunity extends to the* judge as well as to witnesses and *parties to the litigation, for defamatory statements uttered in the course of a trial or contained in pleadings, affidavits, depositions, and other documents directly related to the case.*" (Emphasis supplied)

The same principle was reasserted and reiterated in *DiBlasio v. Kolodner*, 233 Md. 512, 521-522, 197 A. 2d 245. And *cf. Wesko v. G.E.M., Inc.*, 19 Md. App. 161, 169-170, 310 A. 2d 191, 195-196.

In Prosser, *Law of Torts* (4th ed. 1971) the applicable law is set out at Chapter 19, "Defamation," Section 114, "Absolute Privilege," p. 778:

"Likewise the privilege extends to counsel in the conduct of the case; and, since there is an obvious public interest in affording to everyone the utmost freedom of access to the courts, it extends also to the parties to private litigation, as well as to defendants and instigators of prosecution in criminal cases. The privilege covers anything that may be said in relation to the matter at issue, whether it be in the pleadings, [citing *DiBlasio v. Kolodner, supra*] in affidavits, or in open court."

We find totally unpersuasive the one case cited by the appellants, which arguably goes the other way. *Moore v. Rolin*, 89 Va. 107, 15 S. E. 520 (1892), permitted recovery in a libel action on the basis of damage done to a business reputation and credit rating by the filing of a mechanic's lien.* Of only incidental significance is the fact that the court there found that the mechanic's lien was clearly "prematurely filed." Of far greater significance to us is the fact that the court simply did not consider, and presumably was not asked to consider, the question of privilege. We

---

* The Virginia court apparently considered the filing of a mechanic's lien to be a judicial proceeding.

cannot consider it as authority for a point which it did not discuss. What the appellants take to be silent implication may have been, rather, a declining to enter into areas which counsel did not raise. It may also have been a pure oversight.

We hold that the trial judge was not in error in granting the directed verdict in favor of the defendant Bank on the charge of business defamation.

### Abuse of Process

The appellants are also chagrined at the granting of the Motion for a Directed Verdict at the end of the entire case in favor of the Bank on the charge of abuse of process. The thrust of their argument is that the Bank threatened to institute the confessed judgment proceedings in order to force them, in the trustees' action, to pay $5,000 in fees to the Bank's attorneys above and beyond the amount due on the demand notes. The appellants utterly failed, however, to prove that the process of the court was actually abused or perverted once it had issued. It is clear that such actual abuse of the process, above and beyond any ulterior motive in procuring its issuance, is an indispensable element of the common law tort.

In defining "abuse of process," the authorities do so largely by contrasting it with "malicious use of process." *Bartlett v. Christhilf*, 69 Md. 219, 14 A. 518, made it clear that the tort applied to the perverted execution of a writ and not to the method or motivation of its issuance, saying at 69 Md. 229-230:

> "A malicious abuse of legal process consists in the malicious misuse or misapplication of that process to accomplish some purpose not warranted or commanded by the writ. In brief, it is the malicious perversion of a regularly issued process whereby a result not lawfully or properly attainable under it, is secured.

> . . .

> There is nothing on the face of the declaration to

show that the order of the Circuit Court was, *after having been issued,* misused in any way. It was served upon the appellant as its terms directed. He was not arrested and his property was not seized under it. It is true that the count avers that the appellee did maliciously make use of the process of the court by causing to be filed a petition for the purpose of having the appellant declared in contempt, etc.; but *these averments relate to acts done with a view to the procuring of the order, and not to anything done under or in pretended pursuance of the order. The allegations of the count impeach the good faith of the proceedings which culminated in the order. They do not show any abuse of the order when issued. . . . The manner of obtaining the order is quite a different thing from the manner of executing it, when obtained."* (Emphasis supplied)

Relying on *Bartlett v. Christhilf,* the Court of Appeals restated the distinction between "malicious use of process" and "abuse of process" and restated the definition of the latter in *Walker v. American Security Co.,* 237 Md. 80, 87, 205 A. 2d 302:

"A tort action for abuse of process, on the one hand, and the tort actions for malicious prosecution and malicious use of process, on the other hand, are essentially different and independent actions. An action for abuse of process differs from actions for malicious prosecution and malicious use of process in that abuse of process is concerned with the improper use of criminal or civil process *in a manner not contemplated by law after it has been issued,* without the necessity of showing lack of probable cause or termination of the proceeding in favor of the plaintiff, while actions for malicious prosecution and malicious use of process are concerned with maliciously causing criminal or civil process to issue for its ostensible purpose, but without probable cause." (Emphasis supplied)

See also *James v. Goldberg*, 256 Md. 520, 530-531, 261 A. 2d 753.

As an illustration of process regularly issued but then abused in the manner of its execution, *Bartlett v. Christhilf, supra*, cites the classic English case of *Grainger v. Hill*, 4 Bing. N.C. 212, 132 Eng. Rep. 769 (1838). In the *Grainger* case, the defendant had the plaintiff arrested under proper civil process, but then connived with the officer charged with the execution of the writ of arrest to use it as a means to compel the plaintiff to surrender a ship's register, without which the plaintiff could not go to sea. This was held to be "an object totally foreign to that to which the process actually issued." A dictum in *Zablonsky v. Perkins*, 230 Md. 365, 370, 187 A. 2d 314, indicated that the filing of otherwise appropriate criminal charges for larceny after trust in an attempt "to use the State's criminal process as a private collection agency" might well be "a perversion of legal process to improper ends, which might give rise to an action of an abuse of process." [3]

That the critical factor is the actual use made of the process after it has issued is made clear in 1 Am. Jur. 2d, *Abuse of Process*, § 2, "Distinguished from action for malicious prosecution and malicious use of process" :

> "An action for abuse of process differs from an action for malicious prosecution in that the latter is concerned with maliciously causing process to issue, while the former is concerned with the improper use of process after it has been issued.
>
> ... [W]here the thing complained of is not that issuance of the process was wrongfully procured, but that, having been issued, it was wilfully perverted, so as to accomplish a result

---

3. See, however, 1 Am. Jur. 2d, *Abuse of Process*, § 14, "Arrest; criminal proceedings," and cases there cited, which indicate that even an ulterior motive in collecting a bad debt could conjoin with a legitimate motive in bringing a thief to justice, which combination of purposes would defeat a suit for abuse of process.

not commanded by it or lawfully obtainable under it, the action is one for abuse of process."

To a similar effect, see Prosser, *supra*, Ch. 22, "Misuse of Legal Procedure," § 121, "Abuse of Process" :

"Abuse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance. . . . Thus if the defendant prosecutes an innocent plaintiff for a crime without reasonable grounds to believe him guilty, it is malicious prosecution; if he prosecutes him with such grounds to extort payment of a debt, it is abuse of process."

We do not intimate that any legally sufficient evidence was present to establish an ulterior or unworthy purpose in the Bank in instituting the confessed judgment proceedings. We are stressing rather the total absence of the second element of the tort — the willful act in the use of the process, after it had been issued, not proper in the regular conduct of the proceedings. Indeed, even as to the first element of ulterior motive, the actual decision to proceed finally along the confessed judgment route appears to have foreclosed the hoped-for settlement in the trustees' action which would have included the enhanced attorney's fees. If the procurement of the $5,000 in attorney's fees could indeed be deemed an ulterior motive, the antecedent threat to institute confessed judgment proceedings might well have served its purpose, but the actual institution of such proceedings would appear to have been resorted to only when all hope of achieving that ulterior purpose was despaired of. It was the forbearance of proceedings and not the institution of proceedings which was, even according to the appellants, calculated to produce compliance with the request for the enhanced fee.

Even if such ulterior purpose were to be assumed, however, the law is clear that that is but one of two necessary elements of the tort of abuse of process. *Ash v. Cohn,* 119 N.J.L. 54, 58, 194 A. 174, 176, is instructive:

> "An action for malicious abuse of process is distinguished from an action for malicious use of process, in that the action for abuse of process lies for the improper, unwarranted, and perverted use of process after it has been issued; while that for the malicious use of it lies for causing process to issue maliciously and without reasonable or probable cause. . . . Thus it is said in substance, that the distinction between malicious use and malicious abuse of process is that the malicious use is the employment of process for its ostensible purpose, although without reasonable or probable cause, whereas the malicious abuse is the employment of a process in a manner not contemplated by law."

What was actually accomplished by the filing of the confessed judgments is the ultimate test. It is clear that the "process" was used simply to collect the debt and not for "accomplishing some illegal object or purpose for which such process was not legally intended." *Coplea v. Bybee,* 290 Ill. App. 117, 8 N.E.2d 55, 59. It is clear that this was not a case where "the process has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be compelled to do." Id. What motivated the institution of the process is immaterial. What is critical is that once the process had been issued, it served only to do the very thing for which it was precisely intended — to assure the collection of the debt. Abuse of process, as an action, only "lies for the improper, unwarranted and perverted use of process *after it has been issued,* since the malicious abuse of process is the employment of a process *in a manner not contemplated by law." Earl v. Winne,* 14 N. J. 119, 101 A. 2d

535, 544 (emphasis supplied). "[T]he process itself was [not] put to an illegal use." *Baird v. Aluminum Seal Co.*, 250 F. 2d 595, 600 (3rd Cir. 1957).

The appellants are imaginative in their efforts to establish this second element of the tort. They argue initially that "the use of confessed judgments perverted the pending trustees' action." They continue to argue, however, on the basis of intent and not on the basis of ultimate effect. The "undue and excessive attorney's fees" of $5,000, the express thing which they feared and resisted, were never awarded. They fail to show how the use of confessed judgment actions actually "perverted" the pending trustees' action. The Bank, in seeking payment of the notes due, was not limited in remedies it might pursue in effecting collection. The fact that there may have existed another proceeding involving the same subject matter could in no way divest the Bank of its legal rights under the terms of the promissory notes. The possibility that the collateral effects of the Bank's exercise of its legal rights could involve a temporary tying-up of assets held by the trustees, or result in a dispute over attorney's fees, does not establish that second element necessary to hold the Bank liable for the tort of abuse of process.

The appellants' second effort to establish a misuse of the process to achieve an end not contemplated by law is a naked essay in "boot strapping." They argue that "the use of process perverted the confessed judgment action itself." They argue that the regular conduct of proceedings in the trustees' action would have guaranteed the Bank the amounts due on the notes. It was in fact the absence of such a guarantee that was one of the factors that obviously prompted the Bank to initiate the confessed judgment actions. The Bank's attorney properly resisted the abandonment of the Bank's priority claim because there was no assurance that the claim would be honored as a priority one if it were based on the demand notes.

They argue finally that "the issue of process perverted the Show Cause Order." The evidence revealed, however, that the Bank's attorney had already mailed the Declaration and

Confession of Judgment on the notes to the Clerk of the Circuit Court before his receipt of the service of the Rule to Show Cause. There is no rule of law requiring a declarant to withdraw a confessed judgment action when the party declared against subsequently causes a Rule to Show Cause to be issued in a separate equity proceeding.

In all of these arguments, moreover, the appellants take as their predicate the issuance of the process and not the manner of its use following issuance. Just as it is clear that neither an ulterior motive nor a bad intention is sufficient to establish the tort, so too is it clear that even the issuance of process is not itself actionable. There must be an abuse of the process after it has been issued — a utilization of it to achieve an irregular end. 1 Am. Jur. 2d, *Abuse of Process*, § 4, "Elements and requisites of actionable abuse," pp. 252-253, says:

> "It is generally recognized that the elements essential to sustain the action are: (1) that the defendant made an illegal, improper, perverted use of the process, a use neither warranted nor authorized by the process, and (2) that the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of process, and (3) that damage resulted to the plaintiff from the irregularity. While the existence of an ulterior motive may, perhaps, be inferred from the fact that the process has been misused or misapplied, the reverse is not true, for if the act of the prosecutor is in itself regular, the motive, ulterior or otherwise, is immaterial.
>
> An ulterior motive or a bad intention in using the process is not alone sufficient, the bad intent must have culminated in the abuse, for it is the latter which is the gist of the action. An action for abuse of process cannot be maintained where the process was employed to perform no other function than that intended by law. Thus the mere issuance of process is not actionable as an abuse of process;

there must be use of the process, and that use must of itself be without the scope of the process, and hence improper. Or stated another way, the test as to whether there is an abuse of process is whether the process has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be compelled to do."

"[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Prosser on Torts*, p. 857. "If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse . . ." 1 Am. Jur. 2d, *Abuse of Process*, § 13, "Institution and prosecution of civil action," p. 260.[4]

In the last analysis, we are persuaded that there was only the legal pursuit on the part of the Bank of its right and that the action was confined to its regular and legitimate function. We feel as did the New Jersey court in *Ash v. Cohn, supra,* at 194 A. 176:

"[I]f the act be a proper one, the motive is immaterial . . . 'The legal pursuit of one's right, no matter what may be the motive of the promoter of the action, cannot be deemed either illegal or inequitable.' "

The single case relied upon by the appellants, *Hall v. Field*

---

4. And see generally Comment Note, "Action for abuse of process," 80 A.L.R. 580 (1932); Annotation, "Necessity and sufficiency of allegations in complaint for malicious prosecution or tort action analogous thereto that defendant or defendants acted without probable cause," 14 A.L.R.2d 264, Section III, "Actions for abuse or malicious abuse of legal process," pp. 322-326; Goldoftas, *Abuse of Process*, 13 Cleve. Marsh. L. Rev. 163 (1964); Note, *Abuse of Process*, 16 N.C. L. Rev. 277 (1938); Note, *Abuse of Process — Elements of the Cause of Action — Distinguished from Malicious Prosecution — Void Warrant No Bar to Abuse of Process*, 32 Minn. L. Rev. 805 (1948); Note, *Torts — Abuse of Process — Insufficiency of Proof of Improper Motive — Malicious Prosecution — Requirement of Termination in Favor of Plaintiff,* 7 Brook. L. Rev. 123 (1937).

*Enterprises,* 94 A. 2d 479 (D.C. Mun. App. 1953), is in no way apposite. There, the defendants were charged with having "wrongfully and falsely filed a suit against Hall, plaintiff in this case, for breach of a contract which he had not signed, and [with having] illegally and wrongfully pursued the case to judgment and caused his wages to be attached." The charge there was that the defendant not only fraudulently procured process but then abused it, attaching wages not with the object of satisfying the debt but rather "with the intent of embarrassing [the plaintiff] with his employer." The Municipal Court of Appeals for the District of Columbia held that a summary judgment for the defendant should not have been granted and that the "plaintiff's complaint was sufficient to permit proof not only of the mere use of process against him but that it was unlawfully used for a purpose not intended by it or to accomplish a result not lawfully obtainable under it." The issues do not resemble those at bar.

We note, moreover, that the injuries contemplated by this particular tort (and an indispensable element of it) are limited to an improper arrest of the person or an improper seizure of property. See 1 Am. Jur. 2d, *Abuse of Process*, § 4, "Elements and requisites of actionable abuse," pp. 253-254:

"An action for abuse of process will not lie unless there has been either an injury to the person or to property; mere indirect injury to a person's business or to his good name is not sufficient. Indeed, the view has been taken that in an action for abuse of process there must be an actual seizure of the property of the plaintiff or an arrest of his person."

To a like effect is *Baird v. Aluminum Seal Co., supra,* at 602:

"The Pennsylvania Courts following the Statute of Marlbridge (52 Henry III) have held consistently that an action for malicious use or abuse of process will not lie 'If the person be not arrested nor his property seized, no matter how futile and

unfounded the action may be.' . . . What is more, a mere indirect injury to a person's credit or to his name is insufficient."

The Statute of Marlbridge (more generally known as the Statute of Marlborough), 52 Henry III (1268), referred to by the Third Circuit as being followed by the Pennsylvania courts, is listed, as far as certain of its chapters are concerned, in *Alexander's British Statutes* (1st ed., 1870), pp. 41-54, as among those British statutes having force in Maryland.[5] In any event, whether based on the Statute of Marlbridge or not, Judge McSherry reached precisely the same conclusion of law for the Court of Appeals in *Bartlett v. Christhilf, supra,* at 69 Md. 231:

> "All the cases upon this subject depend either upon the arrest of the person or the seizure of his property; and we have been referred to none where this action was sustained for an injury to the plaintiff's business or good name. Any unfounded suit may result in such injury; but it will hardly be seriously contended that where there has been no wrongful deprivation of liberty or no illegal seizure of property, that each unfounded suit is to be treated as such an abuse of the process of the law as will sustain an action against the one who instituted it. At all events, we are not prepared to establish such a doctrine, in the absence of all authority to sanction it, and in view of the vexatious and multiplied litigation to which it would inevitably lead."

### Malicious Use of Process

We now turn from the abuse of process to the use of process (maliciously). Malicious use of process is the civil analogue of malicious prosecution. Indeed, many of the writers analyze the two together as a common action, and use either label to refer to the single tort, whether in its civil or criminal variant.

---

5. And see *Owens v. Graetzel,* 149 Md. 689, 694, 132 A. 265.

With respect to this particular count, we are analyzing, of course, the propriety of the granting of a motion for judgment n.o.v. in favor of the defendant Bank. The trial court is governed by the same considerations in determining a motion for judgment n.o.v. as it is in determining a motion for a directed verdict. *Wheeler v. Katzoff*, 242 Md. 431, 435, 219 A. 2d 250; *Miller v. Michalek*, 13 Md. App. 16, 17, 281 A. 2d 117. For either determination, the trial court "must assume the truth of all credible evidence on that issue and of all inferences fairly deducible therefrom, and consider them in the light most favorable to the party against whom the motion is made . . . ." *Buchanan v. Galliher*, 11 Md. App. 83, 87-88, 272 A. 2d 814.

One further well-established principle of law animates our consideration of this question. "Suits for malicious prosecution are viewed with disfavor in law and are to be carefully guarded against." [6] *North Pt. Constr. Co. v. Sagner*, 185 Md. 200, 206-207, 44 A. 2d 441; *Owens v. Graetzel, supra.*[7]

Five elements must coalesce to permit recovery in an action for malicious use of process. They are:

(1) That a prior civil proceeding was instituted by the defendant;

---

6. Indeed, the common law of England has refused thus far to extend the tort of malicious prosecution to the ordinary civil action, even though it be instituted for an improper purpose and without probable cause; "and this is the position still taken by a large minority of rather less than half of the American courts." *Prosser on Torts*, Ch. 22, "Misuse of Legal Procedure," § 120, "Wrongful Civil Proceedings," pp. 850-851.

7. *Owens v. Graetzel* discusses this point at 149 Md. 694-695:

"Actions for the malicious prosecution of civil suits are not encouraged, because public policy requires that parties may freely enter the courts to seek redress and relief and to enforce their rights, and that this may be done without the peril of a suit for damages in the event of an unfavorable judgment by jury or judge. If this were not the case, a large proportion of unsuccessful civil actions would be followed by suits for malicious prosecution, and so there would be a piling of litigation on litigation without end. Experience has, moreover, demonstrated that the payment of costs, incident to the failure to maintain the suit, is commonly a sufficient penalty, and the fear of the burden of making the payment ordinarily is a sufficient deterrent to unfounded actions."

(2) That the proceeding was instituted without probable cause;

(3) That the proceeding was instituted with malice;

(4) That the proceeding terminated in favor of the defendant therein (the plaintiff in the resulting tort action for malicious use of process); and

(5) That special damages were sustained of a type not normally sustained in the prosecution of like causes of action. *Owens v. Graetzel, supra,* 149 Md. at 695-696; *Siegman v. Equitable Trust Co.,* 267 Md. 309, 317, 297 A. 2d 758, 762; *Walker v. American Security Co., supra,* at 237 Md. 88-89; *Shamberger v. Dessel,* 236 Md. 318, 204 A. 2d 68; *Wesko v. G.E.M., Inc., supra,* at 19 Md. App. 197.

Since all five elements must coalesce to permit recovery, it follows that the absence of any one element will be fatal to the suit. We will consider the case before us element by element.

*Institution of Civil Proceedings:*

The establishment of this element is conceded by the Bank. Docket entries were received into evidence which showed the filing of the confessed judgment declarations, with judgment being entered on December 30, 1969, in the Circuit Court for Prince George's County.

*Want of Probable Cause:*

"Probable cause in a civil action may be defined to be a reasonable ground for belief in the existence of such a state of facts as would warrant institution of the suit or proceedings complained of." *Owens v. Graetzel,* 149 Md. at 696. *Supreme Lodge, American Protective League v. Unverzagt,* 76 Md. 104, 24 A. 323; *Jordan v. James & Holstrom Piano Co.,* 140 Md. 207, 117 A. 366; *North Pt. Constr. Co. v. Sagner, supra,* at 185 Md. 208-209; *Walker v. American Security Co., supra,* at 237 Md. 89.

Simply upon the merits of the case, it is clear to us that there was no want of probable cause. The evidence is uncontroverted that the demand notes were due and unpaid. The confessed judgment notes were the usual and normal kind of confessed judgment notes providing for the payment of attorneys' fees. The notes and the provision for the payment of attorneys' fees were entirely proper and the terms thereof were binding upon the makers. The Bank was of the opinion that, the land having been sold free and clear of the collateral security held by the Bank, the best way to insure that the Bank was paid was to take action against the individuals. It had every right to enforce the payment due it on these notes. The Bank had every right to pursue this course of legal redress. Since it had reason to believe that its claim would be valid upon adjudication, there cannot be, in law, a want of probable cause for the institution of the confessed judgment proceedings.

The satisfaction of the confessed judgments was, furthermore, conclusive proof of probable cause for the filing of the judgments. As was noted in *Owens v. Graetzel*, at 149 Md. 696:

> "As in an action of malicious prosecution for a criminal offense, the conviction of the traverser is commonly conclusive proof of probable cause, so, where the suit is based upon a civil proceeding, a judgment or decree by a court of competent jurisdiction adverse to the defendant in the proceeding is, in general, conclusive proof of probable cause, although the judgment in either class of actions was reversed in an appellate court."

*Want of Probable Cause: Election of Remedies:*

The appellants, nevertheless, continue to fall back upon the proposition not that there was want of probable cause for the Bank to proceed by way of confessed judgment, had confessed judgment alone been available as a remedy, but rather that there was want of probable cause to elect that otherwise appropriate remedy in the face of the adequate

alternative available in the trustees' hearing. They seem to be groping for, but not quite articulating, the doctrine of election of remedies, "sometimes known as the doctrine of election, . . . a species of estoppel." *Petillo v. Stein,* 184 Md. 644, 651, 42 A. 2d 675. It is initially clear that "[t]he doctrine of election of remedies . . . prohibits a party, having a choice of two or more remedies, from selecting one and, after a judgment is rendered on the merits, then seeking to recover on the other remedy." *Levin v. Singer,* 227 Md. 47, 60, 175 A. 2d 423; *City of Baltimore v. Moore,* 209 Md. 516, 121 A. 2d 857. In the case at bar, the Bank did not seek to recover via the confessed judgment notes after a judgment had been rendered on the merits in the trustees' action. That litigation was still pending and was not a *fait accompli.*

It is furthermore clear that the doctrine of election of remedies applies only when two positions taken by the same litigant are necessarily inconsistent. As was said in *Petillo v. Stein, supra,* at 184 Md. 652:

> "The doctrine, however, should only be applied to actions taken by the same litigant which are necessarily inconsistent. . . . The doctrine upon which it is sought to bar his appeal is a severe one, which it is now generally held should not be extended."

And see *Johnson v. R. S. Const. Co.,* 80 F. Supp. 749, 752-753 (D. Md. 1948), applying Maryland law.

In a case involving a factual and legal situation similar to that which faced the appellee Bank in the present case, the Supreme Court of Kansas, in *Kansas City v. Bank of Hamlin,* 79 Kan. 761, 101 P. 617, discussed the inapplicability of the doctrine of election of remedies, at 101 P. 618:

> "The only question presented is whether or not the holder of a chattel mortgage can proceed by attachment to collect his debt, without waiving the mortgage security. It is elementary that two remedies which are inconsistent with each other cannot be invoked at the same time. . . . It is

542

equally elementary that all consistent remedies are freely open to the use of the litigant. This narrows the question to whether the two remedies here involved are inconsistent with each other or not. *The inconsistency which the rule is intended to prevent is one which requires the litigant to insist in one case upon that which he denies in another;* . . . If, on the other hand, a vendor of property holds a note of the vendee for the purchase price of the property sold, which note is secured by mortgage, and the vendee makes default in payment of the note, *the vendor may pursue any or all of the remedies* given by the law for the collection of a debt. He may commence an action to recover judgment upon the note, and foreclose the mortgage; for sufficient cause he may also attach any property of the defendant not included in the mortgage; he may garnishee any other property or money which the debtor has in the possession of another; and he may also, after judgment, levy an execution upon any property of the defendant not otherwise taken, which may be discovered. These remedies are not inconsistent with each other; they are all used for the purpose of enforcing the same right, and all aid in the accomplishment of that end, without conflicting with each other." (Emphasis supplied)

In *Williams v. Robineau,* 168 So. 644 (1936), the Supreme Court of Florida said, at 646-647:

". . . If the remedies are several and consistent, the election of one does not operate to waive the others. Only *full satisfaction* of the right asserted will raise an estoppel to the pursuit of consistent remedies . . . An attempted exercise of an assumed remedy which turns out to be abortive will not preclude one from resorting to another." (Emphasis supplied)

The purpose of the doctrine is made very clear in 25 Am.

Jur. 2d, *Election of Remedies*, § 1, "Definition, nature, and purpose of doctrine," p. 647:

> "The purpose of the doctrine of election of remedies is not to prevent recourse to any remedy, but to prevent double redress for a single wrong. Its rationale is that courts will not permit suitors solemnly to affirm that a given state of facts exists from which they are entitled to a particular relief and afterward affirm or assume that a contrary state of facts exists, from which they are entitled to inconsistent relief. One may not take contradictory positions in asserting a right in court if the assertion of the plaintiff's first right involves a negation of the right as claimed in the second case. In this connection the language of the Scottish law — that a man shall not be allowed to approbate and reprobate [to approve and reject] — is sometimes used."

The doctrine of election of remedies has no application where, as here, the Bank was not seeking "double redress for a single wrong." It was rather seeking single redress by either of two alternative means. It is furthermore clear that the two means to that single end were consistent, rather than inconsistent, with each other. They both sought the collection of a debt. It was not a case where "the assertion of [the confessed judgments] involves a negation of the right as claimed in the [trustees' hearing]." Nor did the Bank pursue the confessed judgment route after the equity case had proceeded to judgment and satisfaction.

In no event, can the doctrine of election of remedies, which is, even in its limited applications, a defense, be asserted as something which the Bank was bound to anticipate and anticipatorily react to, lest it be deemed to have been acting without probable cause with respect to one of the alternatives. We agree with the characterization in *Johnson v. R. S. Constr. Co., supra,* at p. 753, that "the doctrine of election of remedies is an equitable one designed to be used as a shield for defense and not as a sword for attack."

544

*Want of Probable Cause: Reliance on Advice of Attorney:*

Above and beyond our holding that the Bank had, upon the merits of the issue, affirmative probable cause to proceed by way of the confessed judgments, the Bank was further protected from a finding that there was a want of probable cause by its reliance upon the advice of its attorney. This principle is universally recognized. 52 Am. Jur. 2d, *Malicious Prosecution*, § 77, "Advice of attorney or other person — generally," and § 78, "Advice of private attorney," pp. 236-237. The Court of Appeals stated the proposition clearly in *Siegman v. Equitable Trust Co., supra,* at 267 Md. 317:

> "The fact that an attorney acting in good faith in presenting and prosecuting a claim for his client had reasonable grounds to believe his client had a valid claim is sufficient to show probable cause on the part of the client. *North Pt. Constr. Co. v. Sagner, supra* at 208. To hold a defendant liable for civil malicious prosecution under the facts of this case would force all prospective plaintiffs to act at their peril when they rely on the advice of counsel. We refuse to require this."

In *North Pt. Constr. Co. v. Sagner, supra,* the same principle was set out, at 185 Md. 208:

> "In a civil action, it is enough that an attorney at law who acts in good faith in presenting and prosecuting a claim for his client, had reasonable ground to believe that his client had a good case. As stated by Mr. Justice Bradley in *Campbell v. Brown,* 4 Fed. Cas. page 1158, No. 2, 355, 2 Woods, 350: 'If attorneys cannot act and advise freely, and without constant fear of being harassed by suits and actions at law, parties could not obtain their legal rights.' *Peck v. Chouteau,* 91 Mo. 138, 3 S. W. 577, 60 Am. Rep. 236; *Newell, Malicious Prosecution,* page 26. This applies to both attorney and client for, 'in determining probable cause for

initiation of civil proceedings, all that is necessary is that the plaintiff reasonably believe that there is a chance that his claim may be held valid upon adjudication.' *Restatement — Torts*, Vol. 3, page 449."

The Bank's reliance upon its attorney, if nothing else, provided it with probable cause to proceed upon the confessed judgment notes.

*Malice*:

With the collapse of the "want of probable cause" element, collapses also the main support for the appellants' theory of malice — the permitted inference of malice from the want of probable cause. *Kennedy v. Crouch*, 191 Md. 580, 62 A. 2d 582. As an independent strut for this element of the tort, and as a necessary precondition for punitive damages, however, the appellants also argue that they showed "actual malice." They argue again the non-necessity for resort to confessed judgments by the Bank and urge again the ulterior motive of collecting an attorney's fee. We hold that there was no evidence, sufficient in law, to show actual malice.

The Court of Appeals defined "actual malice" in *Drug Fair v. Smith*, 263 Md. 341, 352, 283 A. 2d 392, 398:

"Actual or express malice may be characterized as the performance of an unlawful act, intentionally or wantonly, without legal justification or excuse but with an evil or rancorous motive influenced by hate; the purpose being to deliberately and wilfully injure the plaintiff."

See also *Siegman v. Equitable Trust Co., supra*, at 267 Md. 314.

There was no evidence to support the claim that the confessed judgment actions were instituted for the sole purpose of improperly extracting excessive attorney's fees. Indeed, the seeking of an attorney's fee, as called for under the terms of the confessed judgment notes, is a legal and proper concern of both the Bank and its attorney. The

Bank's attorney had a legitimate concern, indeed a fiduciary duty, to resist any effort to force him to abandon the Bank's position of priority based on the collateral notes and to expose the Bank to the possibility that it might have to share with other general, unsecured creditors. The filing of the confessed judgment action was the pursuit of a legal remedy for the purpose of insuring that the Bank was promptly paid the debt due it. That purpose was achieved. The exercise of a legal right to enforce payment on a debt cannot be said to be a tort merely because a collateral effect of the exercise of the right results in an attorney's fee. Although its action may have resulted in some damage to the appellants, the Bank was motivated by self-interest rather than by a malicious desire to harm the appellants. Such motivation cannot be actual malice.

In this regard, *Siegman v. Equitable Trust Co., supra,* is dispositive, at 267 Md. 314-316:

> "[W]here an act, though wrongful, is committed in the honest assertion of a supposed right and without any evil intention, there is no ground on which punitive damages can be awarded.
>
> . . .
>
> Here, all the record indicates is that the bank, on a mistaken understanding of the law, attempted to satisfy out of a joint checking account the individual debt of Mr. Siegman created by his indorsement on a forged check. There is no evidence that the bank either converted his funds or refused to honor his checks out of evil motives intended to injure the Siegmans. Although it acted so as to damage the appellants, the bank was motivated by self interest rather than by a malicious desire to harm the appellants."

The negation of actual malice may serve as well to dissipate that permitted inference of malice which springs from the want of probable cause.

*Termination of Prior Proceedings in Favor of Defendant Therein:*

It is, moreover, preeminently clear that the confessed judgment actions terminated in favor of the defendant Bank and not in favor of the appellants. The element of the tort of malicious use of process requiring that the prior proceedings terminate in favor of the defendant therein was, therefore, not even arguably satisfied. As a result of the confessed judgment actions, the sum of $52,387, plus interest, was paid in satisfaction of the judgment taken, and the judgment was marked paid and satisfied. Although the appellants had the right to challenge such action and to set forth a defense within 30 days, Maryland Rule 645, *Meyer v. Gyro Transport Systems, Inc.*, 263 Md. 518, 283 A. 2d 608, no such challenge was made. The judgment was permitted to stand and the resultant satisfaction of the claim constituted a disposition of the proceeding in favor of the Bank.[8]

*Special Damages:*

With respect to the final element of the tort, Maryland follows the so-called "English rule." That rule is well spelled out in *North Pt. Constr. Co. v. Sagner*, at 185 Md. 207:

> "Regardless of the attitude of the courts of other jurisdictions, concerning which there is much conflict, and regardless of the contrary view indicated in *Restatement — Torts*, Vol. 3, page 442,

---

8. Even if the appellants were successful in their tortured argument that the payment of the debts came literally through the equity hearing and that the confessed judgment notes were, therefore, abated, the technical distinction would avail them naught. *Schwartz v. Schwartz*, 366 Ill. 247, 8 N.E.2d 668, 112 A.L.R. 325 (1937), deals with this precise point. It held that a prior proceeding terminated favorably to the plaintiff therein, thereby barring a recovery for malicious use of process, just as surely when he received equivalent satisfaction by an alternative route as if he had received literal satisfaction in the prior proceeding itself. The Illinois court said, at 8 N.E.2d 671:

> "While the suit here was dismissed upon acceptance of a tender, such cannot be said to have been a termination favorable to the appellant for the reason that he paid the amount of the note and interest to its due date in order to procure dismissal of the suit. Such payment is, itself, evidence of probable cause for the suit."

> Maryland has steadfastly adhered to the so-called 'English' rule that no action will lie for the malicious prosecution of a civil suit when there has been no arrest of the person, no seizure of the property of the defendant, and no special injury sustained which would not ordinarily result in all suits prosecuted for like causes of action."

And see *McNamee v. Minke*, 49 Md. 122; *Supreme Lodge, etc., v. Unverzagt, supra; Bartlett v. Christhilf, supra; Rieger & Co. v. Knight*, 128 Md. 189, 97 A. 358; and *Wegefarth v. Wiessner*, 134 Md. 555, 107 A. 364. *Owens v. Graetzel, supra*, is very emphatic, at 149 Md. 694, that no action for the malicious prosecution of a civil suit will lie "unless there was a wrongful arrest of the person, or seizure of property, or other special injury which would not necessarily result in all suits prosecuted to recover for like causes."

The appellants concede that they were not arrested and that their property was not seized. Any damage which they may arguably have sustained to their credit ratings and business reputations by virtue of the filing of the confessed judgments was only that damage typically sustained by anyone placed in similar straits. Their argument constantly returns to the theme that they should not have been placed in such straits; they were required to show in this regard, however, not that they should not have been placed in such straits, but rather that they suffered a type of damage that would not ordinarily result to one so placed. In this, they have failed.

In this regard, 52 Am. Jur. 2d, *Malicious Prosecution*, § 15, "Particular judicial proceedings — confession of judgment," p. 196, is instructive:

> "Since a judgment entered on a power of attorney to confess judgment differs from an ordinary civil action only in that a summons is unnecessary, it is subject to the rule, obtaining in some states, by which an action for malicious prosecution is precluded in the absence of some special injury."

Directly on point is *Schwartz v. Schwartz, supra,* at 8 N.E.2d 671:

> "It is not claimed that any of appellant's property was attached or that he was in any way hindered in handling it. While the charge is that because of this judgment against him his credit was injured and his property became subject to a lien for the judgment, yet such are characteristics of all money judgments in ordinary civil cases. There is no evidence that appellant attempted to deal with his property during the few days in which this judgment was in existence. There is no evidence of special loss to him of any character, over and above the ordinary expense and trouble attendant upon the defense of an ordinary civil suit, and, therefore, under the rule announced in *Smith v. Michigan Buggy Co., supra,* and other cases herein cited, there is no showing of special damages."

See also *Publix Drug Co. v. Breyer Ice Cream Co.,* 347 Pa. 346, 32 A. 2d 413; *Docter v. Riedel,* 96 Wis. 158, 71 N. W. 119; and Annotation, *Entry of judgment under power of attorney to confess judgment as ground of action for malicious prosecution,* 112 A.L.R. 331 (1938).

In summation, the appellants failed to establish four of the necessary five elements of the tort of malicious use of process. Any one of such failures was enough to have made the decision of the trial judge in granting the judgment n.o.v. in favor of the Bank a correct decision. We affirm.

In view of our holding that the judge was correct in granting the judgment n.o.v., it is unnecessary to consider the contention of the appellants that the trial judge abused his discretion in conditionally granting a new trial (in the event that he had not been affirmed in his decision on the judgment n.o.v.) unless the appellants agreed to a remittitur of portions of the compensatory damages and a complete remittitur of all punitive damages.

*Judgment affirmed; costs to be*
*paid by appellants.*