Filed: February 2, 2000

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 99-1379
(CA-98-3456-S)

Ray J. Shiflett,

Plaintiff - Appellant,

versus

I.T.O. Corporation, et al,

Defendants - Appellees.

O R D E R

The court amends its opinion filed January 10, 2000, as follows:

On page 4, first paragraph, line 14 -- the word "removed" is corrected to read "remanded."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RAY J. SHIFLETT,
<u>Plaintiff-Appellant,</u>

v.

No. 99-1379

I.T.O. CORPORATION OF BALTIMORE;
WILLIAM LINDSAY,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-98-3456-S)

Argued: December 2, 1999

Decided: January 10, 2000

Before MURNAGHAN and WILLIAMS, Circuit Judges,
and Cynthia H. HALL, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Ransom J. Davis, DANKER, MCINTIRE, DAVIS,
SCHUMM, PRINCE & GOLDSTEIN, P.C., Baltimore, Maryland, for
Appellant. Gil A. Abramson, HOGAN & HARTSON, L.L.P., Balti-
more, Maryland, for Appellees. **ON BRIEF:** Mark S. Saudek,
HOGAN & HARTSON, L.L.P., Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Ray Shiflett filed suit against his former employer, I.T.O. Corporation of Baltimore (ITO), and his former supervisor, William Lindsay, alleging false arrest and imprisonment, malicious prosecution, false-light defamation, and wrongful termination of employment arising out of Shiflett's arrest by Baltimore Port Authority Police after ITO reported that Shiflett had stolen ITO property. The United States District Court for the District of Maryland granted ITO and Lindsay's motion to dismiss on the grounds that § 301 of the Labor Management Relations Act (LMRA) preempted Shiflett's state law claims and because Shiflett failed to exhaust his remedies. Shiflett argues that the district court erred in dismissing his state law claims against ITO because they require no interpretation of the collective bargaining agreement and, therefore, warrant no preemption under § 301. Shiflett also argues that the district court erred by dismissing his state law claims against Lindsay on the basis of preemption because Lindsay, as an individual, is not a signatory to the collective bargaining agreement. Finally, Shiflett contends that he does not have to exhaust his remedies because his Union, Local 333, International Longshoreman's Association, is openly hostile to him. For the reasons that follow, we affirm the district court's dismissal of Shiflett's claims.

I.

On September 27, 1995, Shiflett was working as a mechanic for ITO at the Dundalk Marine Terminal in Baltimore City. Lindsay, who was Shiflett's supervisor, saw Shiflett remove a master brake cylinder from an abandoned 1976 Chevrolet and place it in his own car. Lindsay reported this apparent theft to ITO, which in turn called the Baltimore Port Authority Police. The next morning, when Shiflett reported for work, Port Authority police arrested him for theft and surrendered

2

him to the Baltimore City Police Department. On the same day, ITO fired him.[1]

Shiflett, as a Union member and ITO employee, was subject to the Cargo Agreement, which is the collective bargaining agreement between ITO and the Union. The Cargo Agreement specifies that "pilfering or broaching of cargo [and] theft . . . are Major Offenses which may be dealt with as the circumstances may require, including discharge" and without prior notice to the Union. (J.A. at 53.) The Cargo Agreement also contains grievance procedures for employees who are wrongly disciplined.

After ITO fired Shiflett, the Union negotiated a compromise with ITO to reinstate Shiflett. Under the compromise, ITO agreed to reinstate Shiflett to his former position, with no back pay awarded, provided that Shiflett "agree[d] not to take any further action against any parties with respect to the circumstances underlying his termination and reinstatement." (J.A. at 166.) Although Shiflett refused to sign the agreement, ITO permitted Shiflett to return to work in January 1996. Shortly before he returned to work, on December 4, 1995, the prosecutor nol prossed the theft charges against Shiflett.

After returning to ITO, Shiflett remained concerned about the back pay that he lost as a result of the September 27, 1995 incident. On October 28, 1996, Shiflett sent a letter to the Union president requesting an arbitration date to resolve the back pay issue. The Union apparently did not respond to Shiflett's request, and Shiflett apparently did not send any further correspondence to the Union on this issue. Nearly two years later, on August 20, 1998, Shiflett's counsel sent a letter to ITO describing at least $9,070.00 in back pay losses and demanding resolution of the dispute. On September 25, 1998, ITO's counsel responded with a letter suggesting that Shiflett seek redress through the Cargo Agreement's grievance procedures. ITO's counsel stated that ITO would not raise any timeliness issues with respect to

_____

[1] Shiflett explains that he did not intend to steal the cylinder, but rather that he intended to transfer the cylinder to another ITO vehicle. He also contends that Lindsay had a long-standing grudge against him. It is undisputed, however, that Shiflett removed the cylinder from the vehicle and that Lindsay saw him do so.

3

the grievance procedures. ITO's counsel attached a check for $198.48 for thirteen hours of lost back pay that ITO believed Shiflett was due. Shiflett refused the check. On or about September 28, 1998, Shiflett filed a complaint in the Circuit Court of Maryland alleging false arrest and imprisonment, malicious prosecution, false-light defamation, and wrongful termination of employment. On October 15, 1998, ITO removed the case to federal court. On December 8, 1998, the district court denied Shiflett's motion to remand to state court, finding that "[i]t is crystal clear that the plaintiff's entire case, including the tort claims, are `firmly rooted' in the Cargo Agreement, which leads to a conclusion that there is sufficient federal preemption under section 310 of the LMRA to give this Court removal jurisdiction." (J.A. at 74.) On December 28, 1998, Shiflett voluntarily dismissed his wrongful termination claim and argued that the case should be remanded because there was no longer any basis for § 301 preemption. The district court disagreed. In the meantime, Shiflett had additional trouble at work. On February 3, 1999, after two disciplinary incidents, ITO terminated Shiflett.[2] On February 19, 1999, the district court granted ITO's motion to dismiss on the grounds of § 301 preemption and failure to exhaust remedies.

On March 1, 1999, Shiflett's counsel finally sent a letter to ITO's counsel seeking to reinstitute grievance procedures. On March 9, 1999, Shiflett's counsel sent a similar request to the Union. On March 19, 1999, Shiflett filed his notice of appeal to this Court.

_____

[2] In the first incident, which occurred in May 1998, Shiflett apparently threw ashes from an ashtray into Lindsay's face. ITO initially wanted to suspend Shiflett for ninety days, but the Union negotiated a compromise under which ITO would suspend Shiflett for sixty days with the express warning that any other confrontations would lead to termination. Shiflett agreed to sign a letter to this effect, but thereafter refused to sign the letter. The next incident, which led to Shiflett's termination, occurred on February 3, 1999 when Shiflett apparently shouted at and shoved a foreman in a dispute over his time sheet. Shiflett disputes this version of events, and the Union arranged for a grievance hearing for September 13, 1999. The results of that hearing are not part of our record on appeal.

4

II.

Shiflett raises several issues on appeal that we will address in turn. First, he argues that the district court erred in concluding that § 301 preempted his state law claims for false arrest and imprisonment, malicious prosecution, and false-light defamation. Second, Shiflett contends that § 301 could not have preempted his claims against Lindsay because Lindsay, as an individual, is not a signatory to the Cargo Agreement. Third, Shiflett asserts that the district court erred in requiring that he exhaust his remedies under the Cargo Agreement because the Union was openly hostile to him as demonstrated by its failure to respond to his earlier request for arbitration.

III.

Shiflett initially argues that preemption of his state law claims under § 301 of the Labor Management Relations Act (LMRA) is unwarranted because his claims arise solely from state substantive law. Therefore, he asserts, it is unnecessary to interpret the Cargo Agreement in order to resolve his claims against ITO. Applying the appropriate de novo standard of review, see Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996) (reviewing grant of motion to dismiss de novo); Meekins v. United Transp. Union, 946 F.2d 1054, 1057 (4th Cir. 1991) ("We review the district court's determinations of law de novo."), we disagree and affirm the district court's conclusion that § 301 preempts Shiflett's claims against ITO.

Section 301 of the LMRA "provides federal courts with jurisdiction over employment disputes covered by collective bargaining agreements [and] also directs federal courts to fashion a body of federal common law to resolve such disputes."[3] McCormick v. AT&T Tech-

_____

[3] Section 301 of the LMRA states that

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C.A. 185(a) (West 1998).

5

nologies, Inc., 934 F.2d 531, 534 (4th Cir. 1991) (en banc). Indeed, "the preemptive force of § 301 is so powerful as to displace entirely any state cause of action `for violation of contracts between an employer and a labor organization.'" Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 23 (1983) (internal quotation marks and citation omitted). In determining whether a claim warrants preemption, "the question in preemption analysis is not whether the source of a cause of action is state law, but whether resolution of the cause of action requires interpretation of a collective bargaining agreement." McCormick, 934 F.2d at 535. The collective bargaining agreement consists of both the express provisions of the agreement and the "industrial common law," which includes industry and shop practices that exist outside of the agreement's text and that furnish the context of the agreement. See id. at 536. "Thus, the agreement creates in employees and their employers implied rights and duties, the contours of which are a matter of `federal contract interpretation.'" Id. (quoting AllisChalmers Corp. v. Lueck, 471 U.S. 202, 215 (1985)).

In McCormick, we outlined the proper standards for § 301 preemption in this Circuit. McCormick involved an employer, AT&T, that discarded personal belongings from McCormick's work locker after he was fired, including a personal letter that was retrieved by his co-workers. See 934 F.2d at 533. We concluded that § 301 preempted McCormick's state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, conversion, and negligence in the care of a bailment. See id. at 534. We noted that § 301 preempts state law claims that require reference to the collective bargaining agreement in order to determine whether the employer has a "duty of care," and to define the nature, extent, and scope of that duty. See id. at 536. After examining the elements of McCormick's state law claims, we found that each of his claims required some component of wrongfulness on the part of AT&T before liability could attach. See id. at 535. Consequently, because wrongfulness in this context could not be determined in the abstract, we concluded that it was necessary to interpret the collective bargaining agreement to determine "whether and to what extent AT&T owed McCormick a duty concerning his work locker." Id. at 536-37. We determined that "[i]f [AT&T] owed him no duty and was entitled under the agreement to dispose of the contents of his locker in the manner it did, its actions

6

ipso facto could not have been wrongful under state law." Id. at 537. Whether AT&T's actions could be authorized under the collective bargaining agreement necessarily turned on an interpretation of that agreement. Accordingly, we held that McCormick's claims were pre-empted. See id.

Applying the McCormick analysis, we first look to the state law elements of Shiflett's claims to determine whether interpretation of the Cargo Agreement is necessary to resolve his claims. See id. at 535. Under Maryland law, the elements of defamation are: (1) the defendant makes a defamatory statement to a third person; (2) that statement is false; (3) the defendant is legally at fault in making the statement; (4) the plaintiff suffered harm; and (5) the statement exposes the plaintiff to public scorn, hatred, ridicule, or contempt.[4] See Woodruff v. Trepel, 725 A.2d 612, 617 (Md. Ct. Spec. App. 1999). False imprisonment requires "`deprivation of the liberty of another without his consent and without legal justification.'"[5]

_____

[4] Shiflett alleges "false-light/defamation" against ITO and Lindsay. (Appellant's Br. at 19.) Under Maryland law, false light is not actually a creature of defamation but rather is a form of invasion of privacy. See Ostrzenski v. Seigel, 177 F.3d 245, 252 (4th Cir. 1999) (describing false light under Maryland law as a publication that unreasonably places the plaintiff in a false light if: (a) the false light would be highly offensive to a reasonable person; and (b) the defendant knew or recklessly disre-garded the falsity of the publicized matter and the false light in which the plaintiff would be placed). Based upon Shiflett's brief (see Appellant's Br. at 19 (describing the elements of false-light defamation as a false statement that exposes the plaintiff to public scorn, contempt or ridicule, published to a third person who reasonably understands it to be defama-tory, that in fact damages the plaintiff's reputation)), we construe Shif-lett's claim as one for defamation. In any event, we do not believe that the distinction between false light and defamation materially affects our analysis because each requires a component of fault or unreasonableness before liability can attach. See id. (stating that false light requires an unreasonable publication and knowledge or reckless disregard of falsity); Woodruff v. Trepel, 725 A.2d 612, 617 (Md. Ct. Spec. App. 1999) (stat-ing that defamation requires falsity and legal fault); cf. Bagwell v. Penin-sula Reg'l Med. Ctr., 665 A.2d 297, 315 n.8 (Md. Ct. Spec. App. 1995) (noting that "the principles governing defamation and false light signifi-cantly overlap").

[5] False arrest has the same elements as false imprisonment. See Green v. Brooks, 725 A.2d 596, 605 (Md. Ct. Spec. App. 1999).

7

Montgomery Ward v. Wilson, 664 A.2d 916, 926 (Md. 1995) (quoting Great Atl. & Pac. Tea Co. v. Paul, 261 A.2d 731, 738 (Md. 1970)). Malicious prosecution requires: (1) a criminal proceeding against the plaintiff that was instituted or continued by the defendant; (2) termination of that proceeding in the plaintiff's favor; (3) absence of probable cause; and (4) malice, which is defined as a primary purpose other than bringing the plaintiff to justice. See id. at 922. In this context, probable cause means "a reasonable ground for belief in the existence of such state of facts as would warrant institution of the suit or proceedings complained of." One Thousand Fleet Ltd. Partnership v. Guerriero, 694 A.2d 952, 956 (Md. 1997) (quoting North Point Constr. Co. v. Sagner, 44 A.2d 441, 445 (Md. 1945)). Malice means "actuated by an improper motive;" this motive can be inferred from a lack of probable cause. Id.

Our examination of Shiflett's state law claims reveals one commonality among each of his claims that affects our analysis. Each of Shiflett's claims includes an element of wrongfulness that goes to the manner and nature of ITO's conduct in light of the information that it had at the time of the alleged wrong. Specifically, false-light defamation requires a false statement and "legal[ ] . . . fault in making the statement," Woodruff, 725 A.2d at 617 (internal quotation marks omitted); false arrest requires absence of "legal justification," Wilson, 664 A.2d at 926; and malicious prosecution requires lack of "probable cause" or a lack of "reasonable grounds for belief," One Thousand Fleet, 694 A.2d at 956. ITO's duty with respect to these elements -- including the nature and extent of that duty -- does not exist in the abstract. To determine whether ITO acted improperly when it responded to Shiflett's purported theft, it is necessary to ascertain ITO's authority and responsibilities with respect to its employees in light of ITO's knowledge at the time of the incident. The manner and propriety of ITO's investigation and its subsequent decision to call the Port Authority police "is not a matter of intrinsic moral import but a question of legal authority -- whether management had the lawful right to proceed as it did." McCormick, 934 F.2d at 536. Consequently, resolution of Shiflett's state law claims requires an examination of the Cargo Agreement, including the industrial common law, to determine whether ITO acted wrongfully in its investigation and treatment of Shiflett.

8

The Cargo Agreement contains several provisions that deal squarely with allegations of employee theft, ITO's disciplinary authority to deal with theft, and employee grievance procedures for addressing wrongful action by ITO. For example, section IX.23 (iii), which relates to ITO's authority to discipline its employees without prior notice to the Union, states that "pilfering or broaching of cargo, theft . . . are Major Offenses which may be dealt with as the circumstances may require, including discharge." (J.A. at 53 (emphasis added).) The same section also provides that "[a]ny grievances or disputes hereunder may be submitted to the grievance procedure." (J.A. at 53.) The essence of these provisions is that ITO may, "as the circumstances may require," investigate and deal with employee theft. We have difficulty believing that ITO, by following investigative and disciplinary procedures contemplated by the Cargo Agreement in determining whether an employee has engaged in theft, can also act unreasonably for the purposes of fault, probable cause, or legal justification. Yet, this is exactly the ground for Shiflett's complaint. (See J.A. at 15 ("A minimal investigation by [ITO] and/or a simple inquiry of [Shiflett] concerning his conduct would have revealed that no improper or unlawful activity on his part was involved.").) The Cargo Agreement explicitly grants ITO a certain level of authority and discretion to deal with employee theft. The bounds, scope, and reasonableness of ITO's exercise of that authority can only be determined through an interpretation of the Cargo Agreement as supplemented by industrial common law. Cf. Willis v. Reynolds Metals Co., 840 F.2d 254, 255 (4th Cir. 1988) ("[T]he alleged wrong by Reynolds in the instant case directly dealt with its right pursuant to a collective bargaining agreement to conduct investigations . . . and the associated right to confront the suspected employee."); Mock v. T.G.&Y Stores Co., 971 F.2d 522, 529 (10th Cir. 1992) (affirming district court's conclusion that § 301 preempted plaintiff's various state law claims, including false imprisonment).

Our examination of Shiflett's state law claims and the Cargo Agreement lead us to conclude that Shiflett's claims are preempted by § 301. We note that, unlike other decisions in which we found no preemption "because the claims involved purely factual questions concerning the conduct of the employee and the conduct and motivation of the employer, and because no interpretation of the collective bargaining agreement was required," Owen v. Carpenters' Dist. Council,

9

161 F.3d 767, 776 (4th Cir. 1998), the present case implicates issues of contractual, rather than factual, interpretation. Indeed, the facts in the present case are virtually undisputed: Shiflett took ITO property and placed it in his own car; Lindsay saw Shiflett take this property and, pursuant to his duties as Shiflett's supervisor, reported his observation to ITO, which responded by calling the Port Authority Police. The Port Authority Police then decided to arrest Shiflett and turn him over to the Baltimore City Police. The only question, for our purposes, is whether ITO's response to Lindsay's report -- calling the Port Authority Police upon an allegation of theft from one of its supervisors -- was unreasonable. In other words, the inquiry is whether ITO, in light of the information that it had at the time, properly acted "as the circumstances . . . require[d]" by investigating and reporting Lindsay's observations to the Port Authority Police in the manner that it did. This question can only be answered by the Cargo Agreement, including the industrial common law. For that reason, we agree that Shiflett's claims against ITO are preempted by § 301.

IV.

Shiflett next contends that even if his claims against ITO are preempted, his claims against Lindsay are not because Lindsay, as an individual, is not a signatory to the collective bargaining agreement. Again, applying a de novo review of the preemption question, see Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996) (reviewing grant of motion to dismiss de novo); Meekins v. United Transp. Union, 946 F.2d 1054, 1057 (4th Cir. 1991) ("We review the district court's determinations of law de novo"), we disagree and affirm the district court's conclusion that § 301 preempts Shiflett's claims against Lindsay.

We have previously addressed whether it is possible for § 301 to preempt state law claims asserted against a non-signatory to a collective bargaining agreement. In International Union, United Mine Workers of America v. Covenant Coal Corp., 977 F.2d 895 (4th Cir. 1992), we considered whether § 301 "confer[red] federal jurisdiction to hear claims against non-signatories of a collective bargaining agreement for tortious interference with that agreement." Id. at 897. In Covenant Coal, International Union, United Mine Workers of America (the Union) appealed the district court's dismissal of its

10

§ 301 claim against Covenant Coal based upon tortious interference with contract, which alleged that Covenant had interfered with the Union's collective bargaining agreement with various mine operators. See id. at 896. Covenant, however, was not a signatory to the collective bargaining agreement. See id. at 895-96. Faced with the issue of whether the Union could assert a § 301 claim against a non-signatory such as Covenant, we concluded that "a suit against a non-signatory of a contract cannot be considered a suit for violation of the contract" and affirmed the district court's dismissal of the Union's § 301 claim. Id. at 897. We then addressed whether the district court erred in dismissing the Union's Virginia state law claim for tortious interference with contract on the ground of § 301 preemption. See id. at 899. Analyzing Virginia law, we noted that one of the elements of tortious interference with contract is a breach or termination of the contract and that "[o]nly by interpreting a contract can a court determine whether the contract has been breached." Id. We accordingly concluded that the Union's claim against Covenant was preempted by § 301 notwithstanding that Covenant was not a signatory of the collective bargaining agreement. See id. In doing so, we noted that "[w]e are cognizant of the apparent paradox, inherent in our decision of this case, holding that section 301 of the LMRA bars a federal cause of action for tortious interference with contract, yet simultaneously preempts the identical state law cause of action." Id.

Our decision in Covenant Coal clearly recognizes that § 301 can preempt state law claims against a non-signatory to a collective bargaining agreement.**6** Shiflett asserts, nevertheless, that we should reverse the district court because Covenant Coal is distinguishable: Covenant was a corporate entity whereas Lindsay is an individual. Shiflett relies on Judge Phillips's concurrence in Jackson v. Kimel, 992 F.2d 1318 (4th Cir. 1993), to argue that claims against an individual non-signatory can never be preempted under § 301. Jackson

_____

**6** Likewise, the Fifth Circuit has held that § 301 can preempt claims against an individual employee. See Baker v. Farmers Electric Coop., Inc., 34 F.3d 274, 283-84 (5th Cir. 1994) ("In cases involving claims against fellow employees where the question of section 301 preemption has arisen, courts have governed their determinations on the preemption by the necessity of referring to a CBA for resolution of the claim rather than by the individual status of the defendant.").

11

involved Kimel, a supervisor for AT&T, who allegedly sexually harassed Jackson, an employee under his supervision. See 992 F.2d at 1321. Jackson sued AT&T and included Kimel as an individual defendant in her suit. The district court granted summary judgment on Jackson's claims against both defendants. See id. at 1320. We affirmed the district court's grant of summary judgment in favor of AT&T because Jackson failed to offer sufficient evidence of respondeat superior or negligent retention. See id. at 1323. We reversed the district court's grant of summary judgment with respect to Kimel, however, because Jackson offered sufficient evidence to sustain her state law claim of intentional infliction of emotional distress. See id. at 1325. We then addressed whether § 301 preempted Jackson's claim against Kimel. See id. We noted that "[a]s an employee of AT&T, Kimel is not a signatory to the collective bargaining agreement and cannot be sued for violation of the collective bargaining agreement except as an agent of AT&T." Id. at 1325 n.4. Therefore, "[i]f Jackson's claim against Kimel is preempted by § 301, then summary judgment would be appropriate both because Jackson failed to exhaust her grievance procedures and because Kimel would not be a proper party to a § 301 action." Id. at 1325. After applying the standards of McCormick v. AT&T Technologies, Inc., 934 F.2d 531 (4th Cir. 1991), we concluded that § 301 did not preempt Jackson's claim against Kimel because Jackson's claim did not require interpretation of the collective bargaining agreement. See Jackson, 992 F.2d at 1326. Consequently, we did not address whether § 301 could preempt a state law claim against an individual co-employee.

Judge Phillips's concurrence argued that it was inappropriate to address the preemption issue with respect to Jackson's state law claim against Kimel because "[he did not] believe § 301 preemption was possible as to that claim." Id. at 1328 (Phillips, J., concurring). Judge Phillips reasoned that "[w]hen union employees have sought directly to sue fellow employees in § 301 actions, the claims rightly have been dismissed on the obvious basis that as non-signatories to the employer's collective bargaining agreement, such employees are not amenable to claims for that contract's breach." Id. Consequently, "[i]t would be anomalous indeed . . . if such a fellow-employee could nevertheless be considered a proper party defendant to a state-law tort claim `recharacterized' by preemption as a § 301 breach of contract action." Id.

12

Judge Phillips's concurrence, however, recognized and attempted to distinguish our earlier decision in Covenant Coal, in which we held "that a pendent state-law claim against a non-signatory to a labor contract is subject to § 301 preemption."[7] Id. This Circuit has not adopted Judge Phillips's concurrence, nor do we do so now because Covenant Coal explicitly recognized that state law claims against a non-signatory to a collective bargaining agreement can be preempted by § 301. We can find no principled distinction between a corporate non-signatory and an individual non-signatory that would allow us to avoid our required adherence to binding Circuit precedent. See Industrial Turnaround Corp. v. NLRB, 115 F.3d 248, 254 (4th Cir. 1997) (stating that this Court is bound by a prior decision of another panel absent an en banc overruling or a superseding contrary Supreme Court decision).

In the present case, Shiflett's state law claims against Lindsay for defamation, malicious prosecution, and false arrest are identical to Shiflett's state law claims against ITO. Each of these state law claims also arises from a common set of facts under which ITO "accepted, adopted, ratified and acted upon" Lindsay's accusation of theft as a basis for its decision to call the Port Authority Police. (J.A. at 19.) Because Shiflett's state law claims against ITO and Lindsay are identical, we believe that resolution of Shiflett's state law claims against Lindsay, like his state law claims against ITO, require interpretation of the Cargo Agreement. See ante Part III (discussing preemption of Shiflett's state law claims against ITO). For that reason, we affirm the district court's conclusion that Shiflett's state law claims against Lindsay are preempted by § 301.

V.

Shiflett next argues that the district court erred in concluding that his claims against ITO and Lindsay were barred by his failure to

_____

[7] Judge Phillips distinguished Covenant Coal on the basis that "it involved a federal action in which the primary claim directly invoked § 301 (the claimant in effect `asked for it'), rather than a removed state court action, and it involved a defendant against whom other avenues of relief were available." Jackson v. Kimel, 992 F.2d 1318, 1329 (4th Cir. 1993) (Phillips, J., concurring).

13

exhaust his remedies under the Cargo Agreement because the Union was openly hostile to him and failed to respond to his earlier arbitration request. We disagree.

Generally, a plaintiff must exhaust his remedies before he can bring suit under § 301 in federal court. See Clayton v. International Union, 451 U.S. 679 (1981). There are some limited exceptions to the exhaustion requirement, such as where "the internal union appeals panels cannot reactivate [the] grievance and cannot grant [Shiflett's] reinstatement relief he seeks under § 301." Id. at 696. In such circumstances, "[i]f the internal procedures are inadequate, the employee's failure to exhaust should be excused, and he should be permitted to pursue his claim for breach of duty of fair representation and breach of the collective-bargaining agreement in court under § 301." Id. In Clayton, the Court noted that

> courts have discretion to decide whether to require exhaustion of internal union procedures. In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust.

Id. at 689. We review the district court's decision whether to excuse the exhaustion requirement for an abuse of discretion. See id.

In the present case, the Cargo Agreement provides that "[a]ny grievances or disputes hereunder may be submitted to the grievance procedure." (J.A. at 53.) It is undisputed, however, that Shiflett did not exhaust his remedies under the Cargo Agreement before bringing his state law claims against ITO and Lindsay. Shiflett argues that pursuant to Clayton, the district court should have excused his failure to

14

exhaust his remedies because the Union was openly hostile to him. In particular, he argues that

> the Union cannot be relied upon to accord him a fair and impartial hearing on his grievance. Indeed, Plaintiff's grievance, including his claim for compensation for his lost earnings during the period of time he was unjustly suspended, has been allowed to languish unattended to and unresolved for three years.

(Appellant's Br. at 29.)

However, the only possible evidence of any Union hostility towards Shiflett is that it apparently did not respond to his October 1996 request for arbitration.[8] This lone instance is not enough. Our reading of the record clearly demonstrates that the Union has, on several occasions, represented Shiflett quite adequately. It negotiated a compromise with ITO to reinstate Shiflett after the September 27, 1995 theft incident, although Shiflett later refused to sign the agreement. The Union negotiated successfully with ITO to reduce Shiflett's suspension from ninety days to sixty days after Shiflett threw ashes in Lindsay's face, although Shiflett again refused to sign the agreement. The Union arranged for a September 13, 1999 grievance hearing to resolve Shiflett's disputed February 3, 1999 termination. And, even after the district court dismissed Shiflett's state law claims against ITO and Lindsay, the Union remained responsive to Shiflett's concerns with respect to the September 27, 1995 theft incident. Assuming that the Union initially failed to facilitate arbitration after Shiflett's October 1996 letter, we have little difficulty concluding that Shiflett has otherwise relied quite extensively, and successfully, on the Union throughout the course of his employment. Consequently, the district court did not abuse its discretion in refusing to excuse Shiflett's failure to exhaust his remedies under the Cargo Agreement.

We note that before Shiflett filed suit in federal court, ITO suggested that Shiflett pursue his grievance procedures under the Cargo Agreement and stated that ITO would not raise any timeliness issues

_____

[8] From the record, it is unclear whether the Union responded, and if it did, what action it took.

15

as to the filing of his grievance. Yet, Shiflett ignored this suggestion until the district court ruled against him. Given the extensive and facially adequate history of Union representation on behalf of Shiflett, we are left to conclude that Shiflett's failure to exhaust his remedies is more a reflection of his personal choice to forego the grievance procedures than the Union's purported hostility toward him. (See J.A. at 200-01 (stating in letter from Shiflett's counsel to ITO's counsel dated March 1, 1999 that "Mr. Shiflett now wants to initiate and/or continue such a grievance").) Moreover, it is not our role to evaluate the subjective quality of the Union's representation in light of its record of success in securing, on multiple occasions, reinstatement and other benefits for Shiflett. We affirm the district court's conclusion that Shiflett inexcusably failed to exhaust his remedies before bringing suit against ITO and Lindsay.[9]

VI.

In conclusion, Shiflett's claims against ITO are preempted by § 301 of the LMRA because each of his claims requires interpretation of the Cargo Agreement. Shiflett's claims against Lindsay, as an individual, are also preempted because, like Shiflett's identical claims against ITO, they also require interpretation of the Cargo Agreement. Finally, we conclude that the district court did not abuse its discretion in determining that Shiflett had to, but did not, exhaust his remedies under the Cargo Agreement before bringing his claims against ITO and Lindsay. For these reasons, we affirm the judgment of the district court.

AFFIRMED

_____

[9] Shiflett also argues that the district court erred in finding that the statute of limitations barred his claims. We need not reach this issue because, as noted above, Shiflett inexcusably failed to exhaust his remedies. Moreover, our reading of the district court's order indicates that the district court did not actually address whether the statute of limitations barred Shiflett's claims.

16